COMMONWEALTH *vs.* KEVIN MONTEZ.

No. 96-P-589.

Hampden. September 18, 1997. - November 24, 1998.

Present: BROWN, SMITH, & LENK, JJ.

*Evidence,* Prior misconduct, Identity, Relevancy and materiality, Cross-examination. *Practice, Criminal,* Assistance of counsel, Instructions to jury. *Constitutional Law,* Confrontation of witnesses. *Identification.*

At the trial of indictments, evidence of the defendant's open and gross lewdness, admitted as proof of that charge, was not evidence of a prior bad act with respect to the other serious felony indictments tried together with that charge. [807-808]

Evidence of the method of entry in two uncharged burglaries was sufficiently distinct and sufficiently similar to the method of entry in an armed assault in a dwelling to be relevant to the identity of the assailant, in whose apartment stolen items from all three breaks were found, and was therefore admissible in the assailant's trial on indictments arising from the armed assault. [808-810]

At the trial of indictments, the judge did not err in precluding the defendant from conducting a photo identification, which made use of altered photographs, during cross-examination of the victim, where the altered array was not an accurate depiction of the victim's observations, and where the defendant extensively cross-examined the victim on her identification of the defendant. [810-811]

At the trial of indictments, the jury were sufficiently apprised of the possibility of good faith mistake in identification, and defense counsel was not ineffective for not requesting a specific instruction. [811-812]

INDICTMENTS found and returned in the Superior Court Department on March 24, 1993.

The cases were tried before *John F. Moriarty,* J.

*John M. Thompson* (*Jean M. Fielding* with him) for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

SMITH, J. On October 15, 1993, a Superior Court jury found the defendant guilty on indictments charging him with armed

assault in a dwelling (G. L. c. 265, § 18A); armed burglary (G. L. c. 266, § 14); assault with intent to rob (G. L. c. 265, § 18[b]); assault with intent to rape (G. L. c. 265, § 24); indecent assault and battery on a person over the age of fourteen (G. L. c. 265, § 13H); threatening to commit a crime, namely, murder (G. L. c. 275, § 2); and, open and gross lewdness (G. L. c. 272, § 16). The first six indictments arose from an incident which took place on March 9, 1993, when a young woman (Jennifer) was assaulted by an armed man who broke into her apartment in Springfield. The seventh indictment, charging the defendant with open and gross lewdness, concerned an incident which took place on or about March 15, 1993, and other dates when another young woman (Marisol) saw a man masturbating in the window of an apartment at 106 Longhill Street. All of the indictments were tried together.

On appeal, the defendant alleges that the judge committed reversible error when he allowed the Commonwealth to introduce evidence of his alleged prior bad acts. The defendant also contends that the judge improperly restricted the cross-examination of Jennifer. Finally, the defendant argues that his trial counsel was ineffective for not requesting a good faith mistaken identification instruction.

We summarize the facts that the jury could have found concerning the incidents that formed the basis of the indictments.

1. *Facts.*

a. *The assault incident.* In March of 1993, Jennifer shared a second floor apartment with a roommate at 120 Longhill Street in Springfield. On March 8, 1993, Jennifer went out for the evening. She left her front door open and her keys on a table inside her apartment because her roommate had lost his keys and had no way of getting into the apartment when he returned from work.

The next morning, Jennifer's keys were missing; consequently, she did not lock the door when she left for work. After work, Jennifer and a friend arrived at the apartment at approximately 6:00 P.M. The friend left at about 7:00 P.M., whereupon Jennifer locked the door.

At approximately 8:45 P.M., while talking with her mother on the telephone, Jennifer heard a noise at the back door. She placed the receiver down and went to investigate. As she was walking toward the kitchen, she was met by a man holding a

knife. Jennifer screamed upon seeing him. The man then grabbed her by the neck, held the knife to her throat, pushed her to the floor, and told her to shut up or he would kill her.

The assailant asked if she had any money, and Jennifer replied that her pocketbook was in the living room near the television but that she did not have any money. After entering the living room, the assailant hung up the telephone. He then went through Jennifer's pocketbook while continuing to hold the knife to her throat. Throughout this time, all of the lights were on inside the apartment.

After the assailant went through Jennifer's pocketbook, the telephone rang; Jennifer's mother had heard her scream and called back to determine whether she was all right. The assailant instructed Jennifer to tell her mother that her cats had scared her and that is why she screamed. The assailant stood next to Jennifer with the knife to her throat while she spoke on the telephone. Jennifer's mother told her that her father was en route to her apartment and Jennifer responded, "that's good." Jennifer's mother also asked if someone was with her and whether she wanted her to call the police. Jennifer answered "yes" to both questions and hung up the telephone.

The assailant then grabbed Jennifer by the neck and ordered her to show him a picture of her roommate. He dragged Jennifer to her pocketbook, and she complied with his demand. He told Jennifer that he had been watching her for months, and that on that evening he had been watching her from across the street. The assailant also told Jennifer that he had entered her apartment the night before and taken her keys.

The assailant made Jennifer shut off the lights and told her he was going to rape her. He also threatened to kill her and her roommate if she ever told anybody about him. He then dragged Jennifer by the throat to the hallway between the kitchen and the living room. While holding the knife to her throat, he told her to take off her pants. The assailant lifted her shirt and touched her breasts; he also touched her vagina.

Both Jennifer and her assailant then heard her father's car drive up outside the apartment building. The assailant pulled Jennifer over to a bedroom window and asked who had arrived. Jennifer told him that it was her father. The assailant asked whether her father would use the front or back entrance to her apartment. Jennifer told him that her father would be coming to the back door; consequently, the assailant dragged her to the

front door. The assailant told Jennifer not to call the police and again threatened that if she ever told anybody about what happened, he would come back and kill both her and her roommate. He also said, "I mean it, don't tell anybody. I am not going back to jail for you." By this time, Jennifer's father was banging on the back door. The assailant left, and Jennifer went to the kitchen to let her father into the apartment. She told him that a man with a knife had run out the front door; her father ran out the door in pursuit.

Meanwhile, a police officer responded to a radio dispatch reporting a woman screaming at 120 Longhill Street. The officer, who was in uniform and driving a marked police car, parked his vehicle in front of the apartment building. As he was getting out of the cruiser, he noticed a man walking toward the street from the front entrance of 120 Longhill Street. The man had his hands in his pockets and was wearing a dark coat that was past his waist in length, with a hood over a hat, and dark pants.

The officer saw the man take a left turn onto the sidewalk in front of the building and another left turn onto the driveway of 106 Longhill Street, the building next door. The officer then walked up the sidewalk to the entrance of 120 Longhill Street, and opened the first door into the foyer. As he proceeded toward the second door in the entry, the officer heard someone running down the stairs. He looked through the glass door and saw Jennifer's father racing toward him. Jennifer's father opened the door, told the officer what had happened, and informed him that the assailant "just went right by you." The officer radioed for assistance and began a pursuit in the direction of the man he had seen, but he was unable to locate him. Other officers who responded to the officer's call for assistance checked the backyard and woods behind 120 and 106 Longhill Street, but they did not find the assailant. In addition, although it had recently snowed, the officers did not find foot prints in the yards and woods behind the buildings.

Jennifer told the police that her assailant was wearing a dark colored winter coat that was mid thigh in length. A red bandanna partially covered his face, but she could see her assailant's nose, the side of his face, his cheeks, eyes and part of his forehead. She noticed that he had brown eyes, and dark hair that was either pulled back or shaved on the sides. He appeared to be Hispanic and talked with a Spanish accent; the assailant

also was a few inches taller than Jennifer, who testified that she was five feet, one inch tall.

Later that evening, the police drove Jennifer to a location on Longhill Street where she was asked to look at a young Hispanic man who was standing in front of the cruiser's headlights, holding a knife. Jennifer told the police that the man was not her assailant and that the knife was not the same as the knife carried by her attacker. Although the man was the same height as her assailant, Jennifer told the police that his hair was not the same, and that he had a lighter complexion than her attacker.

b. *The open and gross lewdness incidents and subsequent identification of the defendant as Jennifer's assailant.* Marisol's (the victim in the open and gross lewdness matter) mother lived at 89 Longhill Street, opposite 106 Longhill Street. In February and March of 1993, Marisol visited her mother every day. Because there were few parking spaces in front of her mother's building, Marisol often parked her car in front of 106 Longhill Street. During that time, she frequently observed a naked man, whom Marisol later identified as the defendant, standing in an apartment window at 106 Longhill Street, masturbating. The man often used binoculars to watch Marisol and her sister while he engaged in this conduct. In February of 1993, Marisol's boyfriend confronted the man and asked him to stop, but the conduct nevertheless continued. On March 15, 1993, about six days after Jennifer was assaulted, Marisol and her sister were leaving their mother's apartment when they again observed the naked man standing in the window, watching them and masturbating. Consequently, Marisol called the police.

Two police officers went to 106 Longhill Street in response to Marisol's complaint. Upon arriving at that address, the officers spoke to the sisters, and then entered the building and knocked on the door of the apartment where Marisol had seen the man. The defendant opened the door; he was wearing a pair of shorts and no shirt. The officers arrested the defendant, after which they took certain items from his apartment, including a coat, brown gloves, a knife and a bandanna. On March 16, 1993, Jennifer identified some of the items as being those worn or carried by her assailant.[1] Jennifer was also shown nine photographs of Hispanic males, and she selected the defendant's photograph as being that of her assailant.

---

[1] Jennifer positively identified the gloves and bandanna as being worn by her assailant, and the knife as the same knife he carried. She stated that the

2. *The "bad acts" evidence.* The defendant claims that the judge committed reversible error in allowing evidence of his alleged prior bad acts, including (1) Marisol's testimony concerning her observations of the defendant masturbating, and (2) testimony that the defendant had committed two uncharged burglaries in the vicinity of the address where the assault occurred.

a. *The admission of Marisol's testimony.* Early in the trial the defendant offered to plead guilty to the open and gross lewdness indictment which was based on the masturbating incidents. The defendant retracted his offer after the judge informed defense counsel that even if the defendant pleaded guilty on that indictment, he intended to allow Marisol to testify regarding her observations; the judge ruled that her testimony was relevant to the assault indictments because it tended to show that the defendant was sexually frustrated, and therefore, it had probative value as to the identity of Jennifer's assailant. The judge cited *Commonwealth* v. *Scott,* 408 Mass. 811, 817-820 (1990), in support of his ruling. Marisol subsequently testified that she saw the defendant masturbating on several occasions.

On appeal, the defendant argues that Marisol's testimony constituted evidence of a prior bad act by the defendant, and was not admissible because her testimony (1) was more prejudicial than probative; (2) was not admissible as evidence of modus operandi; (3) was irrelevant to the identity of Jennifer's assailant; and (4) the use of the evidence to show sexual frustration allowed the jury to infer that the defendant had a propensity to commit crimes.

We reject the defendant's argument that Marisol's testimony constituted evidence of an alleged prior bad act of the defendant. Unlike the decisions cited by the defendant, the alleged open and gross lewdness indictment was being tried with the other indictments. Therefore, at the very least, Marisol's testimony was admissible on the open and gross lewdness indictment because it was evidence of the defendant's guilt on that charge.[2] Thus, the judge's ruling regarding the admissibility of Marisol's

coat was the same type as that worn by her assailant, but she could not be "one hundred percent" certain it was the same coat.

[2]On appeal, the defendant raises for the first time a claim that the open and gross lewdness indictment should not have been joined for trial with the assault indictments. The argument, which is contained in one sentence, is presented in conclusory form without any record or legal citation. Conse-

testimony on the other charges cannot be analyzed under those decisions that discuss the admissibility of prior bad acts evidence.

There is another reason why we reject the defendant's argument that the judge's ruling constituted prejudicial error. The jury were never informed by the judge that they could consider Marisol's testimony in determining the identity of Jennifer's assailant.[3] We also note that the judge's instructions to the jury on the elements of the various crimes only mentioned the evidence of masturbation in connection with the open and gross lewdness indictment.[4]

In the circumstances presented here, even if we assume that the judge's ruling allowing Marisol's testimony in evidence on the other indictments was error, it was not prejudicial because we are convinced that "the judgment was not substantially swayed by it." *Commonwealth* v. *Rosado*, 428 Mass. 76, 79 (1998), quoting from *Commonwealth* v. *Flebotte*, 417 Mass. 348, 353 (1994), quoting from *Commonwealth* v. *Peruzzi*, 15 Mass. App. Ct. 437, 445 (1983).

b. *The admission of two uncharged burglaries.* During the search of the defendant's apartment the police discovered, in addition to the objects identified by Jennifer as worn or carried by her assailant, a stereo later identified as belonging to one

---

quently, the claim does not rise to the level of appellate argument as required by Mass.R.A.P. 16(a)(4), as amended, 367 Mass. 921 (1975), and therefore, is deemed to be waived. *Commonwealth* v. *Bowler*, 407 Mass. 304, 310 (1990).

[3]We note that on three occasions the judge inquired whether the defendant wanted the judge to instruct the jury that they could not use Marisol's testimony as evidence of the defendant's bad character or propensity to commit a crime, but could use it as evidence of the defendant's state of mind and for purposes of identification on the assault indictments. Defense counsel rejected the proposed instruction, citing "tactical" reasons for his decision.

The judge was not required to give such an instruction to the jury on his own. See *Commonwealth* v. *Roberts*, 378 Mass. 116, 126 (1979) ("Ordinarily judges are not required, sua sponte, to instruct juries as to the purposes for which evidence is offered at trial").

[4]The defendant argues that the jury were informed by certain statements in the prosecutor's closing argument that they could consider Marisol's testimony in determining the identity of Jennifer's assailant.

In view of the absence from the judge's charge of any instruction that the jury could consider Marisol's testimony on the other indictments, and the judge's instruction that the jury must take the law from the judge and not from counsel, we do not think that the prosecutor's remarks warranted a new trial even if we assume the judge's ruling was error.

O'Brien and jewelry and a car key later identified as belonging to one Frink. The objects had been stolen from the O'Brien and Frink apartments during two separate burglaries that occurred in the vicinity of 120 Longhill Street, and near the time of the assault on Jennifer.

It was the Commonwealth's theory at trial that the defendant had committed the two burglaries, and that the entries into O'Brien's and Frink's apartments had a certain "uniqueness," similar to the method the assailant used in entering Jennifer's apartment. Therefore, the Commonwealth argued that evidence of the two burglaries was admissible on the question of the identity of Jennifer's assailant.

After conducting a voir dire examination of O'Brien and Frink, the judge ruled that the evidence concerning the burglar's entry into their apartments was admissible because when all of the commonalities were taken together, the jury could draw a reasonable inference that the defendant was the perpetrator of the housebreaks, as well as Jennifer's assailant.[5]

"In order for evidence of prior bad acts to be admitted to prove identity, the Commonwealth must show that 'the prior events and the circumstances of the crime charged have such similarities as to be meaningfully distinctive . . . . There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents to warrant the admission of evidence of prior bad acts as tending to prove that the defendant was the person who committed the crime charged.' " *Commonwealth* v. *Jackson*, 417 Mass. 830, 836 (1994).

In Jennifer's case and in the two burglaries, the intruder gained entrance to the apartments in a distinctive manner. Jennifer testified that her keys were missing after she had left the apartment unlocked for her roommate. Although she had locked the door on the evening of the attack, her assailant entered the apartment through that locked door. Her attacker also told her that he had taken her keys the preceding evening.

O'Brien testified that when he returned to his apartment (which was around the corner from Longhill Street) from a weekend away, he found that someone had burglarized it. His front door was secured by an interior chain lock, and his back

---

[5]The judge again offered to give a limiting instruction, but defense counsel requested that he not give one.

door had a dead bolt lock that was operable by a key only. A small piece of glass was broken in the back door, but it was too small for a person to fit through. Based upon these circumstances, O'Brien believed that whoever had broken into his apartment had done so with a key. Frink also testified that from the circumstances of how entry was made into her apartment, she concluded that the burglar had used a key.

The similarities in the method the burglar used to enter each of the premises was sufficiently distinctive, and therefore, relevant to the identity of Jennifer's assailant. This is especially true when considered in conjunction with the fact that items connecting the defendant to each of the burglaries were recovered from his apartment. See *Commonwealth* v. *Lacy*, 371 Mass. 363, 366 (1976) (method used by defendant to gain entrance to victims' apartments was relevant to question of identity). Therefore, the evidence of the two uncharged burglaries was admissible because that evidence was highly probative on a critical issue in the case, "and as such was admissible even if it tended in some manner to show the commission of [other] crime[s]." *Ibid.*

3. *Limitation of cross-examination of Jennifer.* On direct examination, Jennifer testified that she had selected the defendant's photograph from an array of nine photographs. During her cross-examination, the defendant attempted to introduce in evidence the same array of photographs, altered to exclude all of the subjects' facial features except for their noses and eyes. The defendant sought to present the photographs to Jennifer and have her select the defendant's photograph from the altered array. The judge denied the defendant's request. On appeal, the defendant claims error, arguing that the judge improperly restricted cross-examination on the important issue of identification.

"Both the Sixth Amendment and art. 12 [of the Massachusetts Declaration of Rights] guarantee a criminal defendant's right to confront the witnesses against him through cross-examination." *Commonwealth* v. *Miles*, 420 Mass. 67, 71 (1995). The right is not unlimited, however, and although the defendant is entitled to a reasonable cross-examination of the witnesses, the scope of the cross-examination rests largely in the sound discretion of the trial judge. *Commonwealth* v. *Daye*, 411 Mass. 719, 735 (1992).

"In deciding whether a defendant's constitutional right to

cross-examine and thus confront a witness against him has been denied because of an unreasonable limitation of cross-examination, a court must weigh the materiality of the witness's direct testimony and the degree of the restriction on cross-examination." *Commonwealth* v. *Kirouac*, 405 Mass. 557, 561 (1989).

It is undisputed that Jennifer's testimony on direct examination concerning her identification of the defendant was material to an important issue in the case. However, the record of the trial demonstrates that the judge gave the defendant the opportunity to explore in considerable detail the possibility that Jennifer mistakenly identified the defendant as her assailant.

During her direct examination, Jennifer testified that she was with the defendant for twenty minutes during which time the lights were on in her apartment. She was also close to him during the duration of the assault. After the incident, Jennifer gave a detailed description of her assailant's appearance and the clothes he was wearing.

On cross-examination, she testified that the defendant wore a bandanna beneath his nose, and that she could see enough of his hair to identify the color and to observe that he wore it pulled back or shaved on the side. When asked if she focused primarily on the defendant's eyes and nose when selecting his photograph, Jennifer testified that although she concentrated on the eyes and the nose, "they were not the only factor." She testified that she could see the defendant's hair style, his complexion, and his cheeks. The altered array was not an accurate depiction of her observations, and the judge therefore did not abuse his discretion in denying the defendant's request. In light of the defendant's extensive cross-examination of Jennifer on the question of her identification of the defendant, we hold that there was no error.

4. *The absence of a good faith mistaken identification instruction.* "Fairness to a defendant compels the trial judge to give an instruction on the possibility of an honest but mistaken identification when the facts permit it and when the defendant requests it." *Commonwealth* v. *Pressley*, 390 Mass. 617, 620 (1983). Here, the trial attorney did not request it, and on appeal, the defendant argues that counsel was ineffective for not making that request. We disagree.

The failure to make the request did not result in prejudice to the defendant. The judge gave the standard *Rodriguez* charge on

identification. See *Commonwealth* v. *Rodriguez*, 378 Mass. 296, 310-311 (1979). In light of the judge's instructions, the defendant's cross-examination of all of the witnesses, and the final argument of defense counsel, "the jury were sufficiently apprised of the possibility of a good faith mistake in identification and the Commonwealth's burden of proving the defendant's identification beyond a reasonable doubt." *Commonwealth* v. *Ashley*, 427 Mass. 620, 628-629 (1998).

*Judgments affirmed.*