## COMMONWEALTH *vs.* KEVIN MONTEZ.

Hampden. November 9, 2007. - February 28, 2008.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, & CORDY, JJ.

*Evidence,* Prior misconduct, Relevancy and materiality, Motive, Intent, Exculpatory, Identity. *Practice, Criminal,* Instructions to jury, Argument by prosecutor, New trial, Assistance of counsel. *Constitutional Law,* Assistance of counsel.

At the trial of an indictment for murder, a Superior Court judge acted within his discretion in admitting, on the question of the defendant's identity as the person who stole property from the victim's apartment and killed her, evidence of three prior bad acts, where the prior bad acts and the circumstances of the crime charged had such similarities as to be meaningfully distinctive, providing powerfully relevant and probative evidence that the defendant was the victim's killer, and where the judge minimized any potential for undue prejudice by giving a limiting instruction to the jury. [743-747]

No substantial likelihood of a miscarriage of justice arose from the prosecutor's closing statement at a murder trial, where his statement about defense counsel's failure to address certain prior bad act evidence was not a comment on the evidence and did not improperly shift the burden of proof to the defendant [747-748]; where the prosecutor did not misstate the evidence [748-749]; and where the prosecutor's erroneous use of a particular phrase that had the potential to interject racial prejudice into the case was isolated [749-750].

A Superior Court judge properly denied the criminal defendant's motion for a new trial on the basis of ineffective assistance of counsel, where the defendant failed to show that his trial counsel's decision not to call certain witnesses deprived the defendant of an otherwise available defense [750-755]; where the defendant failed to show that a photographic array was unnecessarily suggestive such that he would have prevailed on a motion to suppress [755-757], or that trial counsel's decision not to impeach the witness who identified the defendant based on that array [757-758] or to call an expert witness on eyewitness identification [758-759] was manifestly unreasonable; and where trial counsel's decision not to engage an expert to testify regarding the lack of correlation between certain behaviors and the commission of a sex-related homicide was consistent with counsel's strategy of downplaying prior bad act testimony and focusing instead on a theory that another committed the murder [759].

INDICTMENT found and returned in the Superior Court Department on March 24, 1993.

The case was tried before *John F. Moriarty*, J., and a motion for a new trial, filed on June 24, 2004, was heard by *Judd J. Carhart*, J.

*Chauncey B. Wood* for the defendant.

*Marcia B. Julian*, Assistant District Attorney, for the Commonwealth.

SPINA, J. On January 28, 1994, the defendant was convicted of murder in the first degree on theories of deliberate premeditation and extreme atrocity or cruelty. Our docket indicates that prior appellate counsel obtained a series of continuances that spanned nearly ten years. Current appellate counsel entered his appearance on November 13, 2003, and filed a motion for a new trial on June 24, 2004, in which he made several claims of ineffective assistance of trial counsel. The trial judge had retired, and a different judge denied the motion for a new trial after an evidentiary hearing. The appeal from the denial of the motion for a new trial has been consolidated with the defendant's direct appeal. On appeal the defendant asserts prejudicial error in the admission of evidence of prior bad acts offered to prove the identity of the defendant as the murderer, a substantial likelihood of a miscarriage of justice caused by the prosecutor's closing argument, and error in the denial of his motion for a new trial. We affirm the conviction and the denial of the motion for a new trial, and we decline to grant relief under G. L. c. 278, § 33E.

1. *Background.* On Tuesday, January 5, 1993, Joan Andres, the victim, planned to have dinner with a friend, Lawrence Pilon, to celebrate the fact that both were about to start new jobs. She was in the process of moving and had placed boxes containing many of her belongings in the living room. He drove to her apartment at 16 Sumner Avenue in Springfield. She gave him a sports cap as a Christmas present; he previously had given her a calendar. They talked a while and watched television. After Andres's laundry was done, he helped carry it to her apartment from the cellar of the building. He drank a glass of water and left the glass in the sink. They left her apartment, purchased some take-out food, and then drove to the home where Pilon lived with his mother and sister. At about 10:45 P.M., Pilon drove Andres to her apartment building and then went home. Andres was never again seen alive.

On Monday, January 11, 1993, Michael Arena, a letter car-

rier, was unable to deliver mail to Andres's mailbox because her mail had been accumulating at least since Friday, January 8, and her mailbox was full. He entered the apartment building by opening the unsecured front security door, climbed the stairs to the second floor, and left some magazines and large envelopes next to Andres's apartment door. On January 12 he learned from another tenant, William Hyland, that the mail he left next to her apartment door still was there.[1] Arena and Hyland went upstairs to Andres's apartment and knocked on the door. It opened. Arena called out Andres's name, but there was no response. They closed the door and left.

Hyland telephoned the real estate management company for the building and asked that someone be sent to investigate. On January 14, 1993, a maintenance man went to Andres's apartment. The door was ajar. He called out her name, but received no response. He entered and was drawn to a light in the bedroom, where he saw Andres's naked body on the bed. Her ankles were tied to the bedposts with stockings. He telephoned the Springfield police from another tenant's apartment.

Police arrived quickly. Officers checked the security of the apartment and observed that the rear door, located in the kitchen, was secured with a dead bolt lock and the chain lock was fastened. The rear door opened out to a wooden porch and a set of outside stairs. In the middle room of the apartment a sliding glass door that opened onto a balcony also was closed and locked, but a piece of wood used to prevent the door from sliding in its track was lying on the floor outside the tracks. It was possible to climb onto the balcony from the first-floor balcony below it. One window in the middle room was open about eight inches, but the corresponding storm window was down.

Andres's apartment keys, her car key, and a nineteen-inch television were missing. The police noted the manufacturer and the serial number of the television on the box in which it came, which was in the living room. Andres's coat was on the kitchen floor. The receipt for the cap she gave to Pilon on January 5 and a menu from a restaurant where she and Pilon bought food

---

[1]At approximately 6 a.m. on Sunday, January 10, 1993, William Hyland noticed that the door to Joan Andres's apartment was open and the lights in her apartment were on. The next day he noticed the door appeared to be closed.

on January 5 were in her coat pocket. A lone glass in the kitchen sink revealed a fingerprint identified as Pilon's. The strainer next to the kitchen sink contained dishes that had been cleaned.

A forensic pathologist opined, after autopsy, that Andres had been dead approximately seven days as of the time her body was discovered. He determined that a single gunshot to the right side of her neck caused a loss of blood that resulted in death within several minutes. At the time she was shot Andres's right hand was touching her neck and the end of the gun barrel was in contact with her hand. The bullet passed through her hand, into her neck, and severed the spinal cord. Two stab wounds to the upper left chest and abdomen were inflicted after death. Ligature abrasions on the ankles were caused by the nylon stockings before death. There were no other signs of trauma. Another section of stocking was tied loosely around her neck.

The body produces alcohol postmortem, called "endogenous" alcohol, as it decomposes. The alcohol level of Andres's blood was determined to be .3 per cent, considerably higher than the typical endogenous range of .15 to .2 per cent. The Commonwealth's pathologist could not determine whether Andres had consumed alcohol shortly before her death, which might explain her elevated blood alcohol level. He was unable to cross-check the test results with a urine sample or vitreous fluid from the eyes because of the advanced state of decomposition. However, contamination from the use of a single needle, as occurred here, to draw multiple samples of body fluid for analysis can produce an elevated endogenous blood alcohol level. In addition, there have been reported cases of endogenous alcohol higher than .3 per cent.

Blood droplets on lower portions of the body suggested that Andres might have been shot while she was sitting up. Although there was no evidence of sexual intercourse, the pathologist opined that the killing was sex related because Andres was naked and her legs were spread apart at the time of death. He explained that sexual release may be obtained without intercourse, through bondage of a naked person.

A State police criminalist opined that the absence of blood on Andres's clothing, found at the foot of her bed with multiple

cuts in her pants, shirt, and undergarments, and the pattern of cutting suggest they were cut from her person before she got on to the bed.[2] There was no blood, seminal fluid, hair, fingerprints, or other physical evidence in Andres's apartment that might have been used to identify her killer.

Two months later there was a break in the case. Marisol Ramos and her sister visited their mother on a daily basis at the mother's apartment on Longhill Street in Springfield. During the early part of 1993 a man standing naked behind an apartment window across the street at 106 Longhill Street would watch them through binoculars, expose himself, and masturbate every time they walked from their car to their mother's apartment. Ramos asked her boy friend to talk to the man and ask him to stop. The boy friend spoke to the man, but he did not stop. On March 15, 1993, it happened yet again, and Ramos's boy friend reported it to police. Two officers responded, and went with the boy friend to the apartment at 106 Longhill Street to talk to the man, who turned out to be the defendant. The officers learned that there was an outstanding parole violation warrant against the defendant from New York, and they arrested him.

While the officers were inside the defendant's apartment, they noticed a television that was similar to the one missing from Andres's apartment. The defendant also appeared similar to the description of a man who assaulted a young woman (Jennifer) with intent to rape her the week before.[3] That incident is described *infra.* On March 16, 1993, officers returned to the apartment. Mayra Sotomayor, who occupied the apartment at 106 Longhill Street with the defendant, consented to two searches of the apartment. The serial number on the television matched the number of the one taken from Andres's apartment. A key seized from the defendant's apartment unlocked the deadbolt of the front security door to Andres's apartment building. Police seized another key that could be manipulated to unlock the front door to Andres's

---

[2]Lawrence Pilon identified the clothing as similar to what she wore when they were together on January 5, 1993.

[3]The defendant was convicted in October, 1993, of that charge and other related crimes, including open and gross lewdness arising out of the Ramos incident. His convictions were affirmed on appeal. See *Commonwealth* v. *Montez,* 45 Mass. App. Ct. 802 (1998). Trial on the instant murder indictment began on January 18, 1994.

apartment, but it was not "made to fit that particular lock." Other property seized from the defendant's apartment had been stolen from three other apartments, discussed below, and was offered by the Commonwealth as evidence of prior bad acts.

a. *The Frink housebreak.* On Sunday, February 21, 1993, Eileen Frink returned to her fourth-floor apartment at 149 Sumner Avenue in Springfield after being away for the weekend. She was unable to open her front door because the chain lock had been attached. She had not attached it before leaving her apartment. She requested assistance from her landlord, who cut the chain. The rear door was secured with a dead bolt. An intruder had entered her apartment by climbing through a bathroom window after cutting the outside screen. The window opened onto an exterior porch with stairs that led to porches on the lower floors. The first-floor porch was locked, but a person could climb to the second-floor porch to gain access to the upper floors. Jewelry, money, and keys, including keys to her car, were stolen. Some pieces of her jewelry and an ignition key to her car were seized from the defendant's apartment on March 16.

b. *The assault on Jennifer.* On March 9, 1993, at approximately 9 A.M., Jennifer left her apartment at 120 Longhill Street in Springfield to go to work. She left the front door unlocked because her roommate had lost his keys. She returned to her apartment at approximately 6 P.M. Later, while talking to her mother on the telephone, she heard someone entering through the back door to her apartment. She asked her mother to "hold on a minute." She put the telephone down and went to see who it was. A man she did not know had entered her apartment. She screamed. He grabbed her by the neck with one hand and put a knife to her throat with his other hand. He pushed her into the living room, threw her onto the floor, hung up her telephone, and told her to be quiet. He then demanded her money.

The man stood a couple of inches taller than Jennifer, who is five feet, one inch tall. He wore a winter coat that came halfway down his thighs, a hooded sweatshirt over a baseball cap, brown suede gloves, and a red bandana that covered the lower part of his face, below the cheekbones. Jennifer was looking into his eyes as he spoke. As the man was going through her purse the telephone rang. He told her to tell the caller she screamed because her cats scared her. The cats were in the closed bedroom,

and he could not have known she had cats unless he had been in her apartment before. Jennifer told her mother, the caller, just what he directed.

Jennifer's mother told her she sent her father over. Jennifer said, "Good." Her mother asked if someone was with her. Jennifer said, "Yes." Her mother asked if she wanted her to telephone the police. Jennifer again said, "Yes," then hung up the telephone. A second call came in from a friend, but Jennifer said she was on the telephone with her mother and would call back.

The man turned off all the lights in the apartment and dragged Jennifer into the hallway of the apartment. He told her he had been watching her for months, and that he had her keys. He told her to take off her pants, which she did. He said he was going to rape and kill her, and said he was not afraid because he had done it before. The man ran his hand across her breasts and genital area. When a car pulled up to the rear of the apartment building, he dragged Jennifer to the bedroom window to see who it was. She told him it was her father. He then dragged her to the front door. Before leaving he said if she ever told anybody he would return and kill both her and her roommate. He then said, "I mean it. I'm not going back to jail for you."

Jennifer let her father in through the rear door. He ran after the man, but with no success. A police officer arrived as Jennifer's father was going out the front door of the building. He explained what had happened. Shortly thereafter police took Jennifer to a showup of a man they had detained, but he proved not to be her assailant and the knife he had was too big.

Approximately one week later a police officer asked her to go to the police station to look at some items. She selected a photograph of the defendant from "a stack of photographs," identifying him as her assailant. After she selected the defendant's photograph from the array at the police station, she signed her name on the back of his photograph. The entire array that had been presented to Jennifer at the police station was admitted in evidence. Jennifer was not asked to make an in-court identification of the defendant. At trial Jennifer identified a winter coat and bandana seized from the defendant's apartment as similar to the clothing her assailant was wearing in her apartment. She positively identified a pair of brown suede gloves and a knife seized from

the defendant's apartment as the gloves worn by her assailant and the knife used to threaten her on March 9, 1993.

c. *The O'Brien housebreak.* On March 14, 1993, Timothy O'Brien returned to his apartment at 91 Sumner Avenue in Springfield after a weekend away. He discovered that the chain lock on his front door had been fastened from the inside and he could not open the door. He broke in. His back door, which is accessible by an outside staircase, was locked with a dead bolt lock. Although a window was broken in the back door, it was too small for a person to climb through. Because the front door was locked from the inside with the chain lock, a person would have had to leave through the back door. That person had to have keys in order to engage the deadbolt lock in the back door. A stereo amplifier, some luggage, jewelry, and a compact disc player were stolen. The stereo amplifier and the luggage were seized from the defendant's apartment on March 16.

The Andres, O'Brien, and Frink apartments, at 16, 91, and 149 Sumner Avenue, respectively, as well as Jennifer's apartment at 120 Longhill Street, are all a short distance from the defendant's apartment at 106 Longhill Street.

Also admitted in evidence was a letter that the defendant sent to Mayra Sotomayor in January, 1994. The letter stated, in part:

> "One other thing before I let you go, we were talking about a topic where I told you that the episode happened in the living room. That's incorrect. It happened where everyone knows. Okay? I don't know what made me say it. Maybe it was a little of [Jennifer] mixed in. I'll explain further if you need me to, Ma. Just don't think something else occurred when it didn't."

2. *Evidence of prior bad acts.* The defendant argues that the evidence of prior bad acts was irrelevant to the question of identity, the purpose for which such testimony was admitted. He stresses that the prior incidents were not similar to any aspect of the Andres killing and were not probative of the identity of her killer. He further argues that the prejudicial effect of the evidence outweighed any probative value it may have had. The prior bad act evidence concerning the Frink, Jennifer, and O'Brien incidents was the subject of a pretrial motion in limine by the Com-

monwealth. The judge ruled that the evidence was relevant and probative, that its probative value outweighed its prejudicial effect, and that any undue prejudice could be minimized by a strong limiting instruction. The defendant timely objected to the testimony at trial and thereby preserved the issue for review under the prejudicial error standard. *Commonwealth* v. *Mc-Laughlin,* 431 Mass. 241, 246 (2000).

Generally, evidence of a defendant's prior misconduct may not be admitted to show bad character or propensity to commit the crime charged. *Commonwealth* v. *Trapp,* 396 Mass. 202, 206 (1985). Such evidence may be admitted, however, for other, permissible purposes, including, for example, to "show a common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Commonwealth* v. *Helfant,* 398 Mass. 214, 224 (1986). Where such evidence is relevant, the judge must determine that its probative value on the issue outweighs the undue prejudice that may flow from it. *Id.* at 225. The decision to admit the evidence of prior bad acts is committed to the sound discretion of the judge, whose determination will be upheld absent palpable error. See *Commonwealth* v. *Marrero,* 427 Mass. 65, 67-68 (1998), quoting *Commonwealth* v. *Valentin,* 420 Mass. 263, 270 (1995).

Where, as here, the prior misconduct is offered to prove the identity of the person who committed the crime charged, an element of the Commonwealth's proof, the Commonwealth must show that the prior bad acts and the circumstances of the crime charged "have such similarities as to be meaningfully distinctive." *Commonwealth* v. *Brusgulis,* 406 Mass. 501, 505 (1990). "There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the current and former incidents as tending to prove that the defendant was the person who committed the crime charged." *Id.* at 506. Although a distinctive manner by which prior bad acts were committed is one way to establish identity, see *Commonwealth* v. *Jackson,* 417 Mass. 830, 841-842 (1994) (victims were "hog-tied"), it is not the only way. A calling card, or some other distinctive feature, may suffice. See *Commonwealth* v. *Brusgulis, supra.*

The "distinctiveness" in the Andres-Frink-Jennifer-O'Brien

housebreaks lies in the defendant's possession of a key related to each incident. Keys to Andres's apartment building and Frink's car were seized from the defendant's apartment. The defendant also had a key that could be manipulated to unlock the front door to Andres's apartment. The person who broke into O'Brien's apartment and stole property, some of which was seized from the defendant's apartment two days after it was stolen, had to have a key to lock the deadbolt when leaving through the rear door. Although O'Brien's key was not found in the defendant's apartment, a jury could infer from the short amount of time that had elapsed between the stealing of the property and its recovery in the defendant's apartment, and from the defendant's use of keys in the other incidents, that he was the perpetrator of the O'Brien housebreak. Finally, just before the defendant assaulted Jennifer, he entered through the rear door of her apartment and told her he had her keys, which inferentially were the keys that had been lost. In both the O'Brien and Jennifer incidents, the jury could infer that the defendant kept the keys for at least a short time after the incidents. Those keys were not found in the defendant's apartment, but neither were they discarded or left behind inside O'Brien's or Jennifer's apartment.

The keys alone have virtually no value to anyone but their owners. However, they have extrinsic value to a nonowner who may want them either as a means to enter and steal from someone else's apartment or car; as a source of pleasure from the obvious concern or fear that their continued absence will cause someone whose apartment was broken into; or as a trophy of a crime during which they were used or taken. The "key" motif in these cases is sufficiently unusual to merit the jury's consideration of these prior bad acts on the question of identity.

Other similarities among the four housebreaks enhance their relevance and probative value as prior bad acts offered to prove that the defendant was the perpetrator in each case. Theft was at least one motive in each incident. Property taken from the Andres, Frink, and O'Brien apartments was seized from the defendant's apartment. The defendant demanded money from Jennifer, and a jury could infer that her father's arrival interrupted his plans to take her money. The four apartments are in close proximity to each other and to the defendant's apartment. The

four incidents occurred within slightly more than two months of each other. The defendant's statement to Jennifer that he was going to kill her, and that he was not afraid to kill because he had done it before, reasonably could be inferred to be a reference to Andres, whose apartment building key and television were recovered from the defendant's apartment. The interlocking prior bad act evidence concerning the housebreaks, the keys, the stolen property recovered from the defendant's apartment, Jennifer's identification of the defendant as her assailant, and the defendant's threat to Jennifer in which he said he had killed before, provide powerfully relevant and probative evidence that the defendant was Andres's killer. The defendant's letter to Sotomayor within three weeks of the trial in this case, in which he expresses a confusion about some details between the Jennifer and, inferentially, the Andres incidents supports the inference from the prior bad act evidence that the defendant killed Andres.

We conclude that the judge acted within his discretion in admitting evidence of the three prior bad acts on the question of the defendant's identity as the person who stole property from Andres's apartment and killed her. *Commonwealth* v. *Marrero*, 427 Mass. 65, 71-72 (1998). Based on his observation of the witnesses, the judge properly could conclude that the relevance and probative value of this evidence was very high, and that any potential for undue prejudice could be minimized by a limiting instruction. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 229 (1986).

At the conclusion of Jennifer's testimony, which had followed that of Frink and O'Brien, the judge instructed the jury that they could not consider the testimony about prior bad acts as evidence that the defendant possessed a bad character or had a propensity to commit crimes. He told them that the evidence could be considered only on the question whether the defendant was the person who committed the crimes against Andres. He repeated this instruction at the conclusion of the trial in his final instructions. There was no objection to these instructions, which correctly stated the proper and limited use of such testimony, and jurors are presumed to follow a judge's instructions. See *Commonwealth* v. *Johnson*, 45 Mass. App. Ct. 473, 479 (1998). There was no error.

The judge admitted over objection, as evidence of a prior bad act, testimony of Ramos that the defendant regularly masturbated in front of his window whenever she and her sister visited their mother. The judge relied on our decisions in *Commonwealth* v. *Phinney*, 416 Mass. 364, 375 (1993), *S.C.*, 446 Mass. 155 (2006), and *Commonwealth* v. *Scott*, 408 Mass. 811, 819, 820 (1990), and ruled that the evidence was relevant to the issues of motive and intent (not identity), particularly as to the Commonwealth's theory that the defendant was sexually frustrated. There was no error.

3. *Prosecutor's closing argument.* The defendant argues that, in his closing argument, the prosecutor improperly shifted the burden of proof to the defendant, misstated the evidence, and appealed to the jury's emotions. There was no objection at trial as to these particular claims, so we review to determine if any error created a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993).

a. *Burden shifting.* The prosecutor's statement that defense counsel never addressed the evidence about the Frink, O'Brien, and Jennifer incidents was not a comment on the defendant's failure to present evidence, and it did not impermissibly shift the burden of proof to the defendant. Defense counsel in fact called witnesses to testify for the defense, and he cross-examined Frink and O'Brien. In his closing argument defense counsel dismissed the Frink, O'Brien, and Jennifer incidents as unrelated collateral matters that occurred two months after Andres was murdered. He also argued that there was no modus operandi that connected the defendant to the Andres murder, and he focused particularly on the absence of any forensic evidence (such as hair, blood, semen, or fingerprints) tending to place the defendant inside Andres's apartment. In the context of the "entire argument, as well as in light of the judge's instruction to the jury and the evidence at trial," *Commonwealth* v. *Bourgeois*, 391 Mass. 869, 885 (1984), we view the prosecutor's statement about defense counsel's failure to address the prior bad act evidence as a proper attempt to expose an effective defense strategy of dismissive treatment designed to divert the jury's attention from the identification potential of the evidence. The prosecutor immediately turned to the prior bad act evidence

and argued logically and methodically that it forcefully identified the defendant as Andres's killer.

"Although not dispositive of the issue, the absence of [an objection on this precise point and the absence of a request for a curative instruction] from experienced counsel is some indication that the . . . substance of the now challenged aspects of the prosecutor's argument were not unfairly prejudicial." *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). Moreover, the judge's forceful instruction that the defendant is presumed innocent, that he does not have to prove his innocence, and that the Commonwealth must prove each essential element of the crimes charged beyond a reasonable doubt mitigated any potential prejudice. *Commonwealth* v. *Kozec*, 399 Mass. 514, 517 (1987).

b. *Misstated evidence.* The defendant contends that the prosecutor misstated evidence by arguing that there was no evidence that Andres had consumed alcohol,[4] and that a chemist had testified that a person's body is capable postmortem of producing alcohol at a level of .3 per cent of the volume of blood. Contrary to the defendant's assertion, the Commonwealth's pathologist did not testify that in his opinion Andres had consumed alcohol. The defendant's pathologist *did* testify that in his opinion, because Andres's blood alcohol level was so high, she had to have consumed alcohol shortly before her death. However, on cross-examination, he acknowledged that using just one needle at autopsy to draw body fluid samples could contaminate the samples and affect the reliability of the test results for the level of alcohol. Here, only one needle was used to draw several samples for alcohol testing. In his closing argument the prosecutor referred to the problem of contamination of the samples. His assertion that there was *no* evidence of alcohol must be viewed in light of the entire argument, especially his very next two sentences: "The police went all over the place. Nothing, no evidence that she even drinks, other than a little." Police found no alcohol and no alcohol containers in Andres's apartment, and Pilon testified that he and Andres did not drink alcohol at dinner on January 5. We

---

[4]As we discuss later, *infra* at 751-752, the defendant tried to support his theory that Pilon killed Andres with evidence that she consumed alcohol shortly before her death, and in all likelihood that would have been with Pilon, not with the defendant.

think it unlikely that the jury understood the prosecutor to be doing anything other than asking them to accept the evidence that Andres had not consumed alcohol the night of January 5, and to disregard the defense pathologist's opinion that she had consumed alcohol, where the sample on which he based his testimony likely had been contaminated.

The defendant next argues that the prosecutor misstated the evidence that a chemist testified a dead body can produce a blood alcohol level as high as .3 per cent without alcohol having been ingested. The defendant contends that the chemist in question never testified before the jury, but only in voir dire. Although the Commonwealth's chemist only testified at voir dire, the prosecutor's statement was based on his cross-examination of a chemist with the State police crime laboratory called by the defendant, who did so testify before the jury. The prosecutor did not misstate the evidence.

Finally, the defendant argues that the prosecutor argued without basis that Jennifer "had the opportunity to look at [the defendant] for about twenty minutes." Although Jennifer did not testify to the amount of time she was with the defendant, her mother testified that about twenty minutes passed from the time Jennifer indicated that she wanted her mother to telephone police and the telephone call she received from Jennifer indicating that she was safe and that her father had arrived. Her father testified that it took him approximately fifteen minutes to drive to Jennifer's apartment. The argument was not a misstatement of the evidence.

c. *Appeal to jury emotions.* At one point in his closing argument, the prosecutor asked the following rhetorical questions: "Who takes keys: a house breaker, a sexual deviant? Someone that maybe wants to break into our houses, torment our women?" The defendant asserts that the words "torment our women" in this interracial crime of sex and murder (the defendant is a dark-skinned Hispanic male and Andres was a white female) inflamed the prejudices of the jury and deprived him of a fair trial. See *Commonwealth* v. *Perry*, 254 Mass. 520, 531 (1926) (prosecutors may not appeal to jury sympathy or prejudices in order "to sweep jurors beyond a fair and calm consideration of the evidence"). See also *Commonwealth* v. *LaFaille*, 430 Mass. 44, 57 (1999) (Ireland, J., concurring) (special precautions must

be taken in criminal cases involving allegations of certain types of interracial violence, including interracial murder and rape, "because they are so likely to evoke racial prejudice"). There was no objection to the statement.

The particular phrase should not have been used. A prosecutor's duty is to avoid assiduously interjecting racial prejudice into a case, and the phrase "our women," in the context of this case, has that potential. We view this as error. However, the statement was isolated and there is no hint of a similar error elsewhere in the prosecutor's closing or the trial as a whole. Contrast *Commonwealth* v. *Graziano*, 368 Mass. 325, 331-332 (1975). The focus of this portion of the argument was the strength of the circumstantial evidence, particularly the keys. That argument was very logical and methodical. The absence of any objection from experienced defense counsel suggests that the tone of the argument was not inflammatory or an attempt to interject racial prejudice into the trial. *Commonwealth* v. *Toro*, 395 Mass. 354, 360 (1985). The judge's instruction to determine the facts in a "fair and impartial" manner and "without . . . any bias, any prejudice or any sympathy" adequately checked any unlikely taint this minor error may have caused. We conclude that the remark did not create a substantial likelihood of a miscarriage of justice. *Commonwealth* v. *Marquetty*, 416 Mass. 445, 450 (1993).

4. *Motion for a new trial.* The defendant filed a motion for a new trial in which he raised several claims of ineffective assistance of counsel. The motion judge denied the motion after an evidentiary hearing. We now address the issues raised in the defendant's appeal from that decision.

a. *Failure to offer exculpatory evidence.* The defendant begins by arguing that trial counsel was ineffective for failing to offer evidence that someone other than the defendant had killed Andres. The argument evolves into a failure to interview witnesses. There is no dispute that trial counsel did not interview witnesses whom, the defendant argues, "the pretrial discovery and the testimony at the post-conviction evidentiary hearing established . . . [could have presented] *strong evidence* that a white male — possibly [Stephen] McCauley — killed Andres and took her television" (emphasis added).

We begin with a summary of the defense. Defense counsel implied at trial that Pilon might have killed Andres. Pilon testified that he and Andres had been involved romantically for a brief time in 1988, but she preferred to limit their relationship to a friendship. Thereafter, they saw one another occasionally and enjoyed watching television, movies, hiking, and going out to dinner. During his military service in 1990, Pilon's unit was ordered to give their rifles a female name. He named his after Andres, and he sent her targets he had shot. Pilon was dating a woman at the time he and Andres celebrated their new jobs on January 5, 1993. He testified that his girl friend was aware of his relationship with Andres and that he was going to have dinner with Andres that evening. He also testified that his friendship with Andres did not affect his relationship with his girl friend. Pilon's girl friend confirmed this, although she was upset that he had not telephoned her later on January 5, as promised.

Pilon went to the police station on January 15, 1993, after hearing about Andres's death on the radio. At that time he was asked when he last saw Andres, and provided details of the evening of January 5 in a statement. At a later date he was speaking with Andres's sister, who said to him, "The only reason I trust you is because you touched the glass." Pilon responded that he did not know what she was talking about, adding that he had had a glass of water at Andres's apartment and may have left his fingerprints on the glass. He also said he told police about the glass of water. Andres's sister reported this conversation to police and Pilon was asked to give a second statement. Defense counsel made much of the fact that Pilon first discussed his fingerprints on the glass with Andres's sister, and not with police. He implied that Pilon would not have had any reason to expect that the glass would still be in the sink when he first spoke to police ten days after his dinner with Andres on January 5, unless he knew that Andres had been killed on the date he left the glass in the sink.[5]

In support of his theory that Pilon killed Andres, defense

[5]The prosecutor relied on the presence of the glass in the sink, a receipt for the cap Andres bought Pilon and the restaurant menu that were in her coat pocket since January 5, and the presence of Andres's laundry, which Pilon helped carry to Andres's apartment, as circumstantial evidence that Andres was killed on January 5, 1993.

counsel called a pathologist who testified that Andres's elevated blood alcohol level indicated she had consumed four to five drinks shortly before her death. Defense counsel asked the jury to infer that Andres had been killed by someone with whom she had a social drink, that Pilon lied when he testified they drank no alcohol, and that Andres was not killed by an unfamiliar assailant who, as the Commonwealth theorized, attacked her as she walked in the door after her dinner with Pilon on January 5.

In addition, defense counsel argued that Andres's killing had been staged only to appear as if it had been a sex crime. He pointed out that there was no evidence of intercourse or other sexual activity, and there was no evidence of semen or other body fluid from another person. The defense pathologist had testified that, in his opinion, the ties were placed on Andres's ankles postmortem because there was no evidence of "vital reaction" to the ligature, and there was no blood spatter on these ties despite the Commonwealth's theory that Andres had been sitting up when she was shot and blood had fallen on her lower extremities. He also testified that the absence of blood on Andres's clothing and the straight-line cuts in the clothing are consistent with the articles having been cut after they had been removed from her body, not while they were on her body, as the prosecutor theorized. Defense counsel finished his closing argument with a forceful statement that Andres had not been killed by a sexual deviant, as the prosecutor had theorized during trial, because of the absence of evidence of sexual activity.

It is against this cogent, well-conceived, well-structured, and well-prepared trial strategy that the defendant now faults counsel for failing to call Andres's neighbors, Therese Dow, Marion Lewellyn, and Stephen McCauley, as witnesses. They had given statements to police in January, February, and March, 1993, and defense counsel was provided copies. Dow and McCauley were interviewed by a defense investigator. At the hearing on the motion for a new trial, defense counsel testified that he did not call these witnesses because he did not believe they would be credible.

Dow had given a statement to police on January 25, 1993, in which she claimed to have seen a tall, clean-shaven, white male in a suit and a long black and gray overcoat on January 8 at approximately 10 P.M. standing next to a car in front of Andres's

apartment building, holding two sets of keys and a small television. Fifteen minutes later, when she put out her garbage, she saw the same man inside Andres's apartment. A few minutes later she heard what sounded like three firecrackers. On March 18 she gave another statement to police in which she stated that around the time of Andres's killing she heard a knock on her door and asked who was there. A male voice said, "Kevin." (The defendant's first name is Kevin.) She was afraid and did not open the door. At the hearing on the motion for a new trial, Dow gave confused and contradictory testimony, saying she saw Andres inside the apartment with a man different from the one with the television. She also said she never had seen or met Andres.

Dow also testified that she saw two of her neighbors, whom the defendant contends are Stephen McCauley and Marion Lewellyn, with a television. The defendant further contends that McCauley could have been the white male Dow saw with the television set on January 8, 1993. One problem with this theory is that Dow never identified McCauley, whom she knew, as the man she saw with the television standing next to a car outside the apartment building, or the man she saw fifteen minutes later inside Andres's apartment on January 8. Another problem is that Dow testified that McCauley discarded the box containing the television and the handyman retrieved it from the trash. However, police saw the box containing Andres's television in her apartment, and there is no evidence that a handyman returned the box to Andres's apartment before police first saw it.

McCauley and Lewellyn had given statements to police in early February, 1993. They both stated they had been inside Andres's apartment at least twice — to borrow and then return the items. Both had indicated that they recognized Andres's presence in the apartment building on January 8 by her distinctive walk. McCauley said he also saw Andres. Lewellyn heard what she thought was a car backfiring between 10 and 11 P.M. that night. McCauley, who had died before the hearing on the motion for a new trial, was an abusive man who had assaulted Lewellyn with a butcher knife six to eight weeks before Andres's murder. The defendant claims McCauley's history of violence indicates he was capable of killing Andres. At the time of

Andres's murder, Lewellyn was a recipient of disability assistance for a bipolar disorder, and she was an active drug addict. Around the same time, McCauley experienced increasingly severe auditory hallucinations and also had a drug problem.

The motion judge found that each witness's testimony would have contradicted defense counsel's theory that Pilon murdered Andres on January 5, 1993. He found, based on his observations of them at the hearing on the motion for a new trial, that Dow and Lewellyn (and probably McCauley) would have presented problems as witnesses, presumably because of their obvious cognitive difficulties. The judge also found that Dow might have given potentially damaging testimony about the man named "Kevin" who knocked on her door around the time of Andres's murder. The judge concluded that defense counsel's decision not to call Dow, Lewellyn, or McCauley to testify at trial was not "manifestly unreasonable" in the circumstances. We also note the absence of evidence that McCauley bore hostility toward Andres.

The standard used to determine claims of ineffective assistance of counsel is "to see whether there has been serious incompetency, inefficiency, or inattention of counsel — behavior of counsel falling measurably below that which might be expected from an ordinary fallible lawyer — and, if that is found, then, typically, whether it has likely deprived the defendant of an otherwise available, substantial ground of defence." *Commonwealth* v. *Satterfield*, 373 Mass. 109, 115 n.10 (1977), quoting *Commonwealth* v. *Saferian*, 366 Mass. 89, 96 (1974). Where the claim of ineffective assistance is raised in a motion for a new trial that has been denied, and where the appeal from the denial of that motion is raised in conjunction with a direct appeal under G. L. c. 278, § 33E, we review to determine whether any substantial conduct or omission by counsel "was likely to have influenced the jury's conclusion." *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992). Whether to call a witness is a strategic decision. See *Commonwealth* v. *Adams*, 374 Mass. 722, 728-729 (1978). A strategic decision amounts to ineffective assistance "only if it was manifestly unreasonable when made." *Commonwealth* v. *Martin*, 427 Mass. 816, 822 (1998). "When a motion judge has not presided at the trial, we defer only to the judge's

assessment of the credibility of witnesses at the evidentiary hearing on the new trial motion, but we consider ourselves in as good a position as the motion judge to assess the trial record." *Commonwealth* v. *Haley*, 413 Mass. 770, 773 (1992). Where a new trial is sought based on a claim of ineffective assistance of counsel, the burden of proving ineffectiveness rests with the defendant. *Commonwealth* v. *Comita*, 441 Mass. 86, 90 (2004).

All three potential witnesses would have undermined defense counsel's theory that Pilon killed Andres on January 5, 1993, where all claimed to have heard or seen Andres on the evening of January 8. Their testimony also conflicts with that of the letter carrier, who testified that Andres had not removed the mail delivered to her mail box at least since January 8. These witnesses either barely knew or, in the case of Dow, did not know Andres. Lewellyn and McCauley were drug addicts who also had mental health problems. Dow's testimony generally was confused. Needless to say, these witnesses hardly inspire confidence in what they claim to have seen and heard. Rather than create a "strong" case for yet another third-party culprit, as the defendant asserts, McCauley's involvement as the murderer is purely speculative, and the testimony of three witnesses whose credibility was dubious only would have weakened defense counsel's theory that Pilon killed Andres. As the motion judge recognized, Dow's testimony might even have strengthened the Commonwealth's case had she testified that a person named "Kevin" knocked on her door at around the time of Andres's murder.

The defendant has failed to show how defense counsel's failure to interview these witnesses personally, or his failure to call them to testify, deprived him of an otherwise available defense. He has not shown that defense counsel's decision *not* to call them as witnesses, based on what he believed to be their questionable credibility, was "manifestly unreasonable."

b. *Failure to challenge Jennifer's identification.* The defendant argues that defense counsel should have moved to suppress Jennifer's identification based on a photographic array that he claims was unnecessarily suggestive. In particular, the defendant claims his photograph was the only one that bore the same date Jennifer was asked to view the array; he was the only person in the array wearing a hooded sweatshirt as Jennifer described;

and he was the shortest person in the array and the only one who was "a couple inches taller" than the five feet, one inch Jennifer. The defendant bears the burden of showing he would have prevailed on a motion to suppress the identification. See *Commonwealth* v. *Comita, supra* at 93-94.

At the trial on the Jennifer and Ramos indictments in October, 1993, see *Commonwealth* v. *Montez*, 45 Mass. App. Ct. 802, 810-811 (1998), the defendant filed a motion in limine challenging the photographic array.[6] Although not presented as a motion to suppress, the judge treated the motion in limine as a motion to suppress and made the following findings:

> "I have looked at the nine photographs, and quite frankly, I find them to be a very good and fair collection for purposes of this. They all appear to be young Hispanic males with dark hair. Only one has no facial hair. The others all have mustaches as the photograph, including the photograph of the defendant, all appear to be roughly the same height. I think it is fair enough. I don't think there is anything suggestive about it. I think it was a proper identification and I will not suppress it under those circumstances."[7]

We have examined the photographic array shown to Jennifer, and we agree with the trial judge. The defendant's photograph does not stand out as distinctive in any unnecessarily suggestive way. See *Commonwealth* v. *Thornley*, 406 Mass. 96, 100 (1989). There is no indication that the date on the defendant's photograph, which is at the end of a line of numbers, bore any significance. The defendant's hooded sweatshirt is a generic type, and one of the other males depicted in the array was wearing a sweatshirt. His height is indicated as five feet, four inches, and although he is the shortest person depicted (one was five feet, five inches; three were five feet, six inches; one was five feet, six and one-half inches; one was five feet, seven and one-half inches; and two were five feet, nine inches), the photographs are not fully body portraits and the defendant's height is not sufficiently

---

[6]Defense counsel was the same, as was the trial judge, for both the Jennifer-Ramos trial and the murder trial.

[7]The Commonwealth does not argue that the prior decision constitutes collateral estoppel. See *Commonwealth* v. *Rodriguez*, 443 Mass. 707, 709-711 (2005).

distinctive so as to render the array unnecessarily suggestive. See *United States* v. *Reid*, 527 F.2d 380 (2d Cir. 1975). Contrary to the defendant's claim, his hair style is not distinctively different from the others. There necessarily will be differences in any photographic array, or indeed in any lineup. There is no requirement that the defendant's image or person be surrounded by people nearly identical in appearance to his own. *Commonwealth* v. *Tanso*, 411 Mass. 640, 652, cert. denied, 505 U.S. 1221 (1992). Here, the defendant's photograph contained nothing that distinguished him unfairly from other members of the group of young Hispanic males depicted in the array.[8] We conclude that the defendant has not shown that the array was unnecessarily suggestive such that he would have prevailed on a motion to suppress. See *Commonwealth* v. *Comita*, 441 Mass. 86, 93 (2004).

The defendant further argues that Jennifer's identification was tainted when she was shown a single photograph of the defendant (one not used in the array) shortly before she testified at the Jennifer-Ramos trial, which necessarily tainted her identification at this trial. The short answer to this claim is that Jennifer was not asked to make an in-court identification of the defendant at this trial. The Commonwealth relied solely on her identification of the defendant's photograph from an array. Such an extrajudicial identification is admissible as substantive evidence. See *Commonwealth* v. *Cong Duc Le*, 444 Mass. 431, 436-437 (2005). That extrajudicial identification preceded the incident on which the defendant now relies and could not have been affected by it.

Contrary to the defendant's next claim, defense counsel was not ineffective for failing to question Jennifer about her identification. Defense counsel testified that he asked Jennifer no questions at the murder trial because it only would have served to reinforce her testimony. He further testified that his strategy was

---

[8]Jennifer testified during the Jennifer-Ramos trial that, when she saw the photograph of the defendant's face, she knew right away that he was the person who attacked her. She further testified that she did not know that the numbers on the photographs indicated the person's height and the date the photograph was taken (the date appears as a portion of a larger sequence of numbers and, in some cases, a letter and numbers). She testified she was not influenced by the numbers in making the identification.

to treat the Jennifer matter, like the other prior bad act evidence, as having nothing to do with the Andres murder. The motion judge observed that counsel's strategy to deemphasize the prior bad act testimony was not manifestly unreasonable. We agree.

Failure to impeach a witness does not, standing alone, amount to ineffective assistance. See *Commonwealth* v. *Bart B.*, 424 Mass. 911, 916 (1997). "[A] claim of ineffective assistance based on failure to use particular impeachment methods is difficult to establish. Impeachment of a witness is, by its very nature, fraught with a host of strategic considerations, to which we will, even on § 33E review, still show deference." *Commonwealth* v. *Fisher*, 433 Mass. 340, 357 (2001). See *Commonwealth* v. *White*, 409 Mass. 266, 272 (1991). Here, counsel recently had been through one trial where Jennifer's identification of the defendant as her assailant was the major issue in the case, and she held firm to her identification. His decision to avoid cross-examining Jennifer, whose identification testimony had just withstood the test of cross-examination at the trial three months earlier, and instead adopt a three-part strategy of deemphasizing Jennifer's testimony and the other prior bad act evidence, focusing on the absence of any forensic scientific evidence connecting the defendant to Andres's apartment, and developing a theory that Pilon killed Andres, was not manifestly unreasonable. See *Commonwealth* v. *Rice*, 441 Mass. 291, 306 (2004); *Commonwealth* v. *Cintron*, 438 Mass. 779, 786-788 (2003).

Finally, failure to call an expert witness on eyewitness identification did not amount to ineffective assistance of counsel. Jennifer's identification testimony at the prior trial was strong and it was based on her close proximity to the defendant under well-lit conditions for approximately ten minutes before he turned off the lights in her apartment. Where Jennifer also identified the knife and gloves seized from the defendant's apartment as having been used by the defendant while he assaulted her, the admissibility of expert identification evidence is within the discretion of the trial judge, and might not have been admitted in this case. See *Commonwealth* v. *Ashley*, 427 Mass. 620, 623-624 (1998). Moreover, even if it had been admitted it would not have resulted in the exclusion of Jennifer's identification testimony. Rather, it would have underscored the importance of

that testimony and the other evidence of prior bad acts. As such, it would have been in conflict with counsel's trial strategy.

Counsel is not required to raise every conceivable defense. Indeed, while defenses may be compatible, they also may be incompatible, conflicting, or even contradictory. Even compatible defenses may dilute each other, and counsel may decide reasonably to proceed with only one. It is counsel's duty to exercise his or her best judgment in selecting a strategy that best fits the unfolding circumstances. When counsel's strategic decisions are in issue, we must show "some deference to avoid characterizing as unreasonable a defense that was merely unsuccessful." *Commonwealth* v. *White, supra* at 272. We cannot say that counsel's strategy here was manifestly unreasonable. Rather, it appears well conceived, well prepared, and developed through the exercise of sound professional judgment.

c. *Failure to offer expert testimony on sex-related homicide.* The defendant contends that his attorney was ineffective for failing to call an expert witness to testify to the lack of correlation between publicly masturbating and the commission of a sex-related homicide.

Contrary to the defendant's claim, any such expert testimony would not preclude the admission of the evidence of the defendant's public masturbation. While such expert evidence *might* be admissible, the average juror properly may decide, without expert testimony, whether someone who repeatedly masturbates in public after being requested to abstain is sexually frustrated or indulges in sexually abnormal behavior.

Defense counsel's failure to engage such an expert is consistent with his strategy to downplay the prior bad act testimony and focus instead on his theory that Pilon committed the murder. As we have said above, the strategy was not manifestly unreasonable.

5. *Relief under G. L. c. 278, § 33E.* We have reviewed the transcripts, the entire record, and the briefs, and we conclude that there is no reason to reduce the conviction or grant a new trial.

The conviction is affirmed, and the order denying the motion for a new trial is affirmed.

*So ordered.*