## Commonwealth vs. Starleen Rutkowski.

Hampden. February 11, 2011. - May 24, 2011.

Present: Spina, Cordy, Botsford, Gants, & Duffly, JJ.

*Homicide. Mental Impairment. Practice, Criminal,* Instructions to jury, New trial, Capital case. *Evidence,* Relevancy and materiality, Medical record, Expert opinion.

At the trial of an indictment charging murder in the first degree on a theory of extreme atrocity or cruelty, the judge's charge to the jury, which failed to instruct the jury that they could consider evidence of mental impairment on the question of extreme atrocity or cruelty, created a substantial likelihood of a miscarriage of justice, where the failure to so instruct effectively removed what may have been the defendant's only viable defense to the question of extreme atrocity or cruelty, given that the evidence of the defendant's mental impairment was both significant and a critical aspect of her defense. [797-799]

Statement of the proper use of a criminal defendant's statements to mental health professionals, an issue likely to arise on a retrial of an indictment charging murder in the first degree. [799-800]

Indictments found and returned in the Superior Court Department on September 2, 2004.

The cases were tried before *Peter A. Velis,* J., and a motion for a new trial, filed on June 4, 2009, was considered by him.

*Stewart T. Graham, Jr.,* for the defendant.

*Marcia B. Julian,* Assistant District Attorney, for the Commonwealth.

Spina, J. The defendant was convicted of murder in the first degree on the theory of extreme atrocity or cruelty. The victim was her husband. She also was convicted of an assault and battery on him by means of a dangerous weapon. The defendant filed a motion for a new trial, which was denied. Her appeal therefrom was consolidated with her direct appeal. On appeal she asserts (1) error in the judge's failure to instruct the jury that they could consider evidence of mental impairment on the question of extreme atrocity or cruelty; (2) ineffective assistance

of counsel in the manner in which trial counsel presented the issue of mental impairment in his closing argument as to extreme atrocity or cruelty; (3) error in the judge's limiting instruction as to the use of the defendant's statements to mental health professionals; and (4) that we should reduce the verdict to murder in the second degree or manslaughter or grant a new trial pursuant to our power under G. L. c. 278, § 33E. We conclude that the jury were not properly instructed that they could consider evidence of mental impairment on the question of extreme atrocity or cruelty, but that the conviction of murder in the second degree may stand unless the Commonwealth elects to move for a new trial.

1. *Background.* The victim was disabled due to partial paralysis on one side of his body. He moved very slowly and had difficulty speaking. The victim was infatuated with the defendant, and behaved "chivalrously" toward her. The victim had a long history of mental illness and other problems.

When the defendant woke on the morning of August 17, 2004, the victim was not in the apartment. He frequently left without first telling her where he was going, which upset her and made her frustrated and angry. After he returned, the victim and the defendant went to work at a small contract job they had cleaning the post office in the town of Wales. The postmistress pointed out some areas to the defendant that required additional attention. The defendant became enraged and started arguing with the postmistress. As a result, the postmistress told her to leave. The victim put his arm around the defendant and tried to escort her out of the building, but she struggled with him.

They went fishing later that afternoon at a lake in Wales. While they were fishing an argument erupted between them. The victim walked away. After a period of absence, the defendant searched frantically for him for about two hours without success. She eventually drove to their apartment in Palmer without him and made a cup of tea to calm herself. At about 6 P.M. the victim appeared in the parking lot outside their apartment. The defendant was both relieved that he had arrived safely, and angry that he had left her without telling her where he had gone. She rushed outside and demanded to know how he had arrived home. She became frustrated when he did not answer

her, and told him she had had it with him and was "kicking [him] out" of the apartment. The victim started laughing.

At that time neighbors heard the defendant screaming at the victim. She called him "retarded," and she told him he would no longer need his personal belongings because "he was going to be dead very soon." The victim remained calm and made no effort to explain himself. He just laughed. The defendant went into their apartment, gathered the victim's belongings, and threw them down the stairs. She then removed his belongings from the van and threw them in a nearby dumpster. The victim continued laughing. The defendant drove away in the van, returned, and deliberately drove into him. She drove over the victim, then backed up over him, and repeated the maneuver several times, driving over him about five times in all. The defendant then parked the van and told one neighbor to "[g]et back into [her] own apartment," or she was going to be next.

Police arrived and found the victim lying on the ground. An officer asked the defendant if she saw what happened. She said, "Yes, I did. I ran him over. We had what you'd call a domestic situation here." The defendant was placed under arrest. The victim was taken to a hospital where he died shortly thereafter.

The defendant gave an audio-recorded statement to police beginning at about 9 P.M. that night. She did not appear to be under the influence of any substance. She was cooperative and related the events of the day, except for the incident with the postmistress. The defendant indicated that she had been treated for mental illness, but said she was not on any medication other than what she took for migraine headaches. After a detective told her that her husband had passed away and that she would face criminal charges, she was reinterviewed. She repeated essentially the same details, except the second time she said the victim had pushed her and she struck him back. She also said she did not mean to hit him a second time with the van, although she intended to hit him the first time. She never mentioned running over him more than twice.

The defendant presented expert psychiatric testimony that included a review of her long history of mental illness; her history of violent and tumultuous personal relationships; her family history of mental illness; her medical history of closed head

injuries[1]; her history of prior commitments to mental hospitals; her history of attempted suicides; diagnoses that included psychotic depression, personality disorders, and bipolar disorders; a review of personal interviews with the defendant; and a review of witness statements and police reports, which included a statement of the defendant. The defense psychiatrist observed that the defendant was not taking medication for her bipolar disorder, but she was taking antidepressants for her migraine headaches. He opined that an "unopposed antidepressant," that is, an "antidepressant without the mood stabilizers," had the effect of "fuel[ing] the bipolar disorder." He concluded that her bipolar disorder, depression, history of psychosis, and head injuries "were in play" at the time of the killing.

The defense psychiatrist opined that, at the time of the killing, the defendant was suffering from a mental disease or defect, and, as a result, she lacked substantial capacity to conform her conduct to the requirements of the law.

2. *Jury instruction on mental impairment.* At the close of the evidence the judge held a charge conference. In addition to an instruction on criminal responsibility, the defendant requested that the jury be instructed as to mental impairment. Specifically, she requested an instruction, conformably with *Commonwealth v. Rosenthal*, 432 Mass. 124, 130 (2000), and *Commonwealth v. Gould*, 380 Mass. 672, 683-686 (1980), that the jury could "consider the defendant's mental condition at the time of the killing, including the effect of any mental impairment, if any, on all of the factors that are relevant in determining whether or not the Commonwealth has proven beyond a reasonable doubt that the defendant committed the murder with extreme atrocity or cruelty."[2] The judge indicated he would instruct on mental impairment.

However, when the judge instructed the jury, he instructed on mental impairment only as it related to intent and knowledge. Intent and knowledge are not aspects of extreme atrocity or

---

[1]The defendant also presented the testimony of a neuropsychologist who testified that the defendant's brain injury interfered with her ability to think, to reason, and to cope effectively.

[2]This was the instruction we approved in *Commonwealth v. Rosenthal*, 432 Mass. 124, 130 (2000).

cruelty.[3] Moreover, the context in which the instruction was given, immediately after the instruction on murder in the second degree, suggested that mental impairment related only to the issue of malice. This was error. It should have been made clear to the jury that they could consider evidence of mental impairment on the specific question whether the murder was committed with extreme atrocity or cruelty. See *Commonwealth* v. *Rosenthal, supra.* See also Model Jury Instructions on Homicide 61-62 (1999). Put differently, the jury should have been instructed that they "may consider what effect, if any, the defendant's impaired capacity had on [her] ability to appreciate the consequences of [her] choices. Thus, the defendant's mental impairment is to be weighed in evaluating the . . . factors customarily associated with extreme atrocity or cruelty." *Commonwealth* v. *Gould, supra* at 686 n.16. See *Commonwealth* v. *Rosenthal, supra* at 130 n.7.

Defense counsel failed to object to the instruction given and instead stated he had no objection to any of the instructions. The issue is unpreserved. See *Commonwealth* v. *White*, 452 Mass. 133, 138-139 (2008). We review to determine if the error in the instruction created a substantial likelihood of a miscarriage of justice. See *Commonwealth* v. *Wright*, 411 Mass. 678, 682 (1992).

In *Commonwealth* v. *Gould, supra* at 680, 687, we exercised our power under G. L. c. 278, § 33E, and granted a new trial, where the "major issue [was] the effect of the defendant's serious, long-standing mental illness on the conduct complained of," and where the jury had not been given the opportunity to "consider the defendant's mental illness and its effects on his *conduct*" (emphasis added). *Id.* at 685. Here, the jury were told they could consider the defendant's mental impairment as to her intent and knowledge, but not her *conduct.* See *Commonwealth* v. *Rosenthal, supra* at 130 n.7. The defendant here, as in the

---

[3]The Commonwealth need not prove that the extreme atrocity or cruelty was premeditated, see *Commonwealth* v. *Breese*, 389 Mass. 540, 545 (1983); that the defendant intended to inflict extraordinary pain, see *Commonwealth* v. *Freiberg*, 405 Mass. 282, 288, cert. denied, 493 U.S. 940 (1989); or that she knew that her acts were extremely atrocious or cruel, see *Commonwealth* v. *Gilbert*, 165 Mass. 45, 58-59 (1895). See also *Commonwealth* v. *Cunneen*, 389 Mass. 216, 227 (1983).

*Gould* case, had a long history of serious mental illness. This defendant also had a history of brain damage. Contrast *Commonwealth* v. *Shelley*, 381 Mass. 340, 355 (1980) (no relief granted under G. L. c. 278, § 33E, where no mental impairment instruction sought, issue was not preserved, and defendant had no psychiatric history in case tried before *Gould* but appeal heard after *Gould*).

The sole defense in this case was lack of criminal responsibility and its closer relative, mental impairment. "Impairment of a defendant's ability to make a decision in a normal manner may have a direct bearing on the degree of murder, and consequently, on the issue of extreme atrocity or cruelty." *Commonwealth* v. *Gould, supra* at 686. We think that where evidence of the defendant's mental impairment is significant and where it is a critical aspect of her defense, the failure to instruct the jury that they could consider evidence of that impairment on the question of extreme atrocity or cruelty effectively removed what may have been her only viable defense to the question of extreme atrocity or cruelty. We cannot say that this error did not likely influence the jury's verdict. *Commonwealth* v. *Wright, supra*. Cf. *Commonwealth* v. *Gould, supra* at 680 (failure to instruct jury on use of evidence of mental impairment when deciding issue of extreme atrocity or cruelty requires new trial under G. L. c. 278, § 33E).

3. *Remaining issues.* Because of the result we reach, we need not decide the question of ineffective assistance of counsel (counsel's argument as to the use of evidence of mental impairment when considering the question of extreme atrocity or cruelty).

We turn to the question of proper use of the defendant's statements to mental health professionals, which may arise at retrial. The defendant contends that the jury erroneously were instructed that they could not consider her statements to her mental health professionals, set forth in her medical records, for the truth of such statements, unless, at the time they were made, they were statements of present pain or present mental state. The judge also instructed that other statements in the medical records, and statements the defendant made to her expert witnesses, could not be considered for the truth of such statements,

but only as the basis for the experts' testimony as it relates to the defense of criminal responsibility. Defense counsel did not object to this instruction and stated expressly that he had no objections to the jury instructions.

An instruction limiting consideration of a defendant's statement to her expert as the basis for the expert's opinion, not for the truth of the underlying statements, is a correct statement of the law. See *Commonwealth* v. *Brown*, 449 Mass. 747, 768 (2007). Similarly, only those statements in medical records relating to treatment and medical history, provided they possess characteristics justifying the presumption of reliability, are admissible for their truth. See *Bouchie* v. *Murray*, 376 Mass. 524, 528 (1978); G. L. c. 233, § 79. There was no error.

Finally, we turn to our disposition of this case. Because we discern no error in the jury's verdict as to murder in the second degree, on remand, the Commonwealth has the option of moving to have the defendant sentenced on the lesser included offense of murder in the second degree or of retrying the defendant for murder on the theory of extreme atrocity or cruelty.[4] See *Commonwealth* v. *Lennon*, 399 Mass. 443, 449-450 (1987); *Commonwealth* v. *Brown*, 392 Mass. 632, 646 (1984). See also *Commonwealth* v. *Dillon*, 79 Mass. App. Ct. 290, 299 (2011); *Commonwealth* v. *Kastner*, 76 Mass. App. Ct. 131, 141 (2010).

4. *Conclusion.* The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

*So ordered.*

---

[4] The defendant has requested a new trial or, alternatively, a reduction of her conviction to murder in the second degree or manslaughter.