NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-11765

COMMONWEALTH vs. HERBERT DORAZIO.


Middlesex.     February 3, 2015. - September 2, 2015.

Present: Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.


Rape. Assault with Intent to Rape. Evidence, Prior misconduct, Relevancy and materiality. Practice, Criminal, Trial of indictments together, Mistrial, New trial, Assistance of counsel, Fair trial, Collateral estoppel, Double jeopardy. Constitutional Law, Fair trial, Double jeopardy. Due Process of Law, Fair trial, Collateral estoppel. Fair Trial. Collateral Estoppel.



Indictments found and returned in the Superior Court Department on February 12, 2009.

The cases were tried before Thomas P. Billings, J., and a motion for new trial, filed on April 6, 2012, was heard by him.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.


Marissa Elkins for the defendant.
Patrick G. Fitzgerald, Assistant District Attorney, for the Commonwealth.

HINES, J.  In July, 2010, a jury in the Superior Court found the defendant, Herbert Dorazio, guilty of rape of a child, Susan, by force, and of assault with intent to rape a second child, Jane.[1,2]  The defendant appealed.  In a memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed the convictions.  Commonwealth v. Dorazio, 85 Mass. App. Ct. 1127 (2014).  We granted the defendant's application for further appellate review.

Represented by new counsel on appeal, the defendant argues that his convictions should be reversed because the judge erroneously (1) denied his motion for relief from prejudicial joinder; (2) admitted certain evidence of prior bad acts and other propensity evidence; (3) denied his motion for a mistrial; and (4) denied his motion for a new trial based on ineffective assistance of trial counsel.[3]  For the reasons that follow, we reverse his convictions.

_____

[1] In the interest of privacy, we use the same pseudonyms adopted by the Appeals Court.  Commonwealth v. Dorazio, 85 Mass. App. Ct. 1127 (2014).  See Commonwealth v. Aviles, 461 Mass. 60, 61 n.1 (2011).

[2] The jury acquitted the defendant of indecent assault and battery on a child under the age of fourteen (Jane), G. L. c. 265, § 13B.

[3] The Appeals Court consolidated the defendant's direct appeal with the appeal from the denial of his motion for a new trial.

Facts.  We recite the facts that the jury could have found, reserving the development of other facts to the discussion of specific issues raised.  Commonwealth v. McCoy, 456 Mass. 838, 839 (2010).  The incidents giving rise to the charges took place at the defendant's home.  Susan and Jane, the complainants, were neighbors of the defendant.  Their families were part of a close-knit residential neighborhood, in which there were many families with young children who would frequently socialize together.  While initially the defendant engaged with the adults during these occasions, he later gravitated toward spending time with the children.

During the summer after Susan completed kindergarten, in 1996, she was playing with several children in the defendant's basement.  The defendant asked her to go outside with him to look at something in the back yard.  They went through a door in the basement that opened up under a deck.  The other children stayed inside.  The defendant knelt down on his left knee, touched Susan on her back, and asked her to sit on his right knee.  Susan complied.  The defendant put his hand on Susan's inner thigh, then slid his fingers under her shorts and under her underwear.  He inserted one of his fingers into her vagina and moved it "in circular motions."  This went on for a "few minutes," until the defendant heard something and they went back inside the house.

Approximately one to two weeks later, "[i]t happened again." Susan was playing at the defendant's house with other children and the defendant asked her to go outside with him. Under the deck, he knelt on one knee and had her sit on the other. The defendant put his hand inside her underwear and inserted a finger into her vagina, moving it "[a]round and in and out" for a "few minutes."[4]

Sometime around 2000 or 2001, the defendant separated from his wife and moved out of the neighborhood. He did not, thereafter, attend any neighborhood gatherings.

In June, 2008, after seeing the defendant at a gasoline station, Susan went home "hysterical" and told her mother (the first complaint witness for Susan) that the defendant had "hurt her" and in response to her mother's questions "looked at her lap."[5]

---

[4] During Susan's cross-examination, defense counsel questioned her about using a ladder to view a bird's nest under the defendant's porch. Susan recalled a bird's nest somewhere under the defendant's porch, but not using a step ladder to see it.

[5] During the cross-examination of Susan's mother, she recalled a bird's nest in the deck area of the defendant's porch in the summer of 1996. Her daughter showed it to her. Susan's mother, however, denied that the defendant had informed her of an incident involving Susan where Susan had fallen off a step ladder that she had climbed to view the nest. Susan's mother also testified that the defendant did not give her a video recording of the bird's nest.

Concerning the other complainant, during the late spring or early summer of 1998, when she was six years of age, Jane testified to playing Wiffle ball with some children in the defendant's back yard; the defendant was pitching. The ball went into some nearby woods. The defendant asked Jane to go inside his house to get another ball. Jane followed the defendant to the laundry room in the basement. The defendant told Jane that the Wiffle balls were on a shelf above the washing machine that he could not reach. He told her that she would have to reach for the ball and lifted her on top of the washing machine. As Jane stood on top of the machine, the defendant touched the inside of her knee with one hand. The defendant then moved his hand under Jane's underwear and touched her vagina, moving his fingers around "[v]ertically" for about ten seconds. Frozen, Jane heard something jingle and the defendant took her right hand, put his penis in it, and told her, "Hold on. Hold this."[6] In seventh grade, Jane first told a friend (her first complaint witness) about the incident.

Over the defendant's objection, the judge admitted evidence from three witnesses concerning an incident that took place on June 13, 1998, at a restaurant in Burlington involving the

_____

[6] These facts served as the basis for indecent assault and battery charge, on which the defendant was acquitted.

defendant and a young girl, J.D., who was six years of age.[7] J.D. testified that, on that date, she was at the restaurant with friends and family celebrating her birthday. She and a friend[8] were in a play tube along with other children. Also present was an adult male and his toddler son. The girls tried to avoid the man, but he cornered them in a dead end and began chatting with them. J.D. gave a description of the man, but was unable to identify him in the court room.

When his son started crawling in the opposite direction, the man placed his hand on J.D.'s knee and his other hand on her friend's knee. His hand went up and under her dress and inside the front of her underwear, where it stayed for a minute or two before there was an interruption of some kind and the man and

---

[7] Before J.D. testified, the judge gave an extensive limiting instruction concerning the use of the evidence of this incident, telling the jury that the Commonwealth bore the burden of proving by a preponderance of the evidence that the incident had occurred; that the incident formed the basis of a criminal charge for which the defendant had been acquitted; that the jury could not consider the evidence as bad act or propensity evidence or as a substitute for proof that the defendant committed the crimes charged in this case; and that they could consider the evidence only on the limited issue whether the defendant had acted intentionally or by mistake, accident, or some other innocent purpose and not for any other purpose. Before the other two witnesses testified, the judge reminded the jury that this instruction also applied to their testimony.

[8] The friend did not testify.

the girls headed in opposite directions.  J.D. later saw the man when she was with her father.

J.D.'s father testified that, at the party, another parent had approached him, after which he summoned J.D. from the tube structure and asked her if someone had touched her, then asked her to point out who had done so.  She identified a man the father had seen earlier in the tubes, and whom he identified in the court room as the defendant.  J.D.'s father told the manager that his daughter had been assaulted and requested that he telephone the police.

Burlington police Officer Charles T. Ferguson responded and was directed to a man he identified at trial as the defendant. After the defendant identified himself, the officer administered the Miranda warnings to the defendant and told him that he wished to speak with him about some "allegations" concerning some improper touching of girls.[9]  Asked whether he had had any contact with any children not his own, the defendant replied that "he may have had an accidental bumping of children up while he was in there playing with his children, but as far as knowingly touching them, he said absolutely not."

---

[9] The judge gave a limiting instruction at this point, to the effect that the officer's statements were not evidence and that the jury were to consider only the defendant's responses.

The defendant testified.  He denied placing Susan on his knee or sexually assaulting her, and denied spending time with Jane in his basement and placing her on top of the washing machine and touching her as she testified.  The defendant recalled taking his toddler son, in 1998, to a restaurant where they met two girls in a tube play structure.  He testified that they remarked on his "cute baby," who then crawled all over them.  The defendant had to change position, but was able to pull his son away from the girls.  The defendant and his son crawled away and the girls "scooted by" and "bumped" him as they passed.  The defendant was arrested later that day, was tried, and was acquitted.[10]

Discussion.  1.  Joinder.  Contrary to the defendant's contention, there was no abuse of discretion in the denial of his motion for relief from prejudicial joinder.  Commonwealth v. Walker, 442 Mass. 185, 199 (2004).  The facts of this case demonstrate that, although each offense involved different complainants, they were similar insofar as age and gender, and both were neighborhood children who knew the defendant and to whom the defendant had access.  Commonwealth v. Gaynor, 443

---

[10] During his direct and cross-examination, the defendant testified about an incident in which he claimed that Susan climbed a step ladder to see a bird's nest under his deck.  She was unsteady, almost fell off, and the defendant had to grab her by the leg and the buttocks to lift her down.

Mass. 245, 260-261 (2005). In addition, the manner and circumstances in which each had been isolated from the other children, distracted, and touched demonstrated that the offenses were related for joinder purposes because they involved a common pattern of conduct. Commonwealth v. Pillai, 445 Mass. 175, 181-182 (2005). The temporal proximity between the offenses, two years, was not too remote, and both offenses took place at the defendant's home. Gaynor, supra; Commonwealth v. Feijoo, 419 Mass. 486, 489 (1995) (five-year time span for joined offenses not overly attenuated). Last, the defendant failed to show prejudice of a nature that is so compelling that he was denied a fair trial. Gaynor, supra at 263.

2. Admission of evidence relating to prior acquittal (the alleged incident involving J.D.). The judge delayed ruling on the Commonwealth's motion in limine to admit evidence of the alleged incident involving J.D. until the fourth day of trial, at which time he allowed the motion over defense counsel's objection. The defendant argues that the erroneous admission of this evidence prejudiced him and deprived him of his right to a fair trial and due process under the State and Federal Constitutions. We address first the defendant's contention that the evidence lacked relevance as rebuttal to the defense of accident or lack of intent and that, on that basis, it was inadmissible under general evidentiary principles. Because we

discern no error in the admission of the evidence on relevancy grounds, we go on to resolve the issue on the constitutional grounds raised for the first time in this appeal.

a. Admissibility under evidentiary principles. The defendant objected at trial to the admission of the evidence on relevancy grounds. Therefore, we review this claim for prejudicial error. Commonwealth v. Montez, 450 Mass. 736, 744 (2008). "Generally, evidence of a defendant's prior misconduct may not be admitted to show bad character or propensity to commit the crime charged." Id. "However, such evidence may be admissible, if relevant, to show a common scheme or course of conduct, a pattern of operation, absence of accident or mistake, intent, or motive." Commonwealth v. Barrett, 418 Mass. 788, 793-794 (1994). "When a court is presented with evidence of uncharged conduct by the defendant toward a child other than the complainant, the conduct in issue, to be admissible, must be closely related in time, place, and form of acts to show a common course of conduct by the defendant . . . so as to be logically probative." Id. at 794.

"If the judge finds that the evidence in question meets the above requirements, he or she next must determine whether its probative value is outweighed by a risk of undue prejudice to the defendant." Id. "It is implicit in the general rule regarding the inadmissibility of prior bad acts evidence that

the admission of such evidence carries with it a high risk of prejudice to the defendant."  Id. at 795.

"Before prior bad act evidence can be admitted against a defendant, the Commonwealth must satisfy the judge that 'the jury [could] reasonably conclude that the act occurred and that the defendant was the actor.'"  Commonwealth v. Rosenthal, 432 Mass. 124, 126 (2000), quoting Huddleston v. United States, 485 U.S. 681, 689 (1988).  "The Commonwealth need only show these facts by a preponderance of the evidence."  Commonwealth v. Rosenthal, supra at 126-127.

The defendant argues that, at trial, his defense counsel did not raise a defense of accident or lack of intent such that the evidence would have been relevant to rebut such a defense. The record does not support this contention.  See Commonwealth v. Kingston, 46 Mass. App. Ct. 444, 449-450 (1990) ("Whether a defense has been fairly raised is a matter of law for the court").  Prior to the introduction of the bad act evidence (the alleged incident involving J.D.), defense counsel questioned both Susan and her mother about the existence of a bird's nest under the defendant's deck and Susan's use of a ladder to view it.  See notes 4 and 5, supra.  This cross-examination laid a foundation to question the defendant about these matters when he testified.  See note 10, supra.  Then, in his closing argument, defense counsel stated that Susan was not lying, but was

"confused" about what had transpired between her and the defendant. What really had happened, according to defense counsel, was that Susan had fallen off a ladder and the defendant had touched her buttocks when he grabbed her to catch her. Although defense counsel did not use the words "accident," "mistake," or "lack of intent," this essentially was what he was arguing. Viewing the record as a whole, we are able to see beyond the euphemism "confusion" and recognize the development and existence of a defense of accident or mistake at trial. Thus, we conclude that the judge acted within his discretion in admitting the evidence on the question whether the defendant had acted with intent and on the issue of the absence of accident or mistake.

The defendant contends the evidence should not have been admitted because it lacked a close relation in time, place, and form of acts to be logically probative. We disagree.

As to time, the alleged incident involving J.D. occurred in June, 1998. The conduct in this case allegedly occurred in the summer of 1996 (Susan) and between February, 1998, and February, 1999 (Jane). Thus, we conclude that the alleged incidents were sufficiently close in time.

Turning to place, although the alleged acts against the complainants in this case occurred at the defendant's home and the alleged acts involving J.D. took place at a restaurant, both

locations were in Burlington. More significantly, the defendant allegedly committed the acts that took place at a location and time when young children were separated from their parents and in circumstances where he was able to create a distraction before allegedly touching them.

Concerning the acts themselves, the defendant commenced by allegedly touching each complainant's underwear. We add that the complainants were the same gender and near the same age. These numerous similarities were sufficient to show "a common course of conduct by the defendant . . . so as to be logically probative." Barrett, 418 Mass. at 794.

The judge properly could conclude that the relevant and probative value of the evidence concerning J.D. was very high and that the potential for undue prejudice could be minimized by a limiting instruction. Montez, 450 Mass. at 746. The judge's limiting instructions stated the proper and limited use of the testimony. See note 7, supra. He repeated this instruction at the conclusion of trial in his final charge, and the jurors are presumed to follow the instructions. Commonwealth v. Francis, 432 Mass. 353, 359 (2000). There was no error under existing evidentiary law. Montez, supra.

The "manner" in which the evidence concerning J.D. came in does not alter our conclusion. Here, the defendant argues that undue prejudice resulted because J.D. alluded to the possibility

that there was another alleged victim.  The record does not support this contention.  J.D. testified to her personal observation that in addition to touching her, the defendant put his hand on her friend's knee, no more.  While the responding officer testified thereafter that he went to the restaurant to investigate and questioned the defendant about the "possible explicit touching of . . . young female girls," it was clear from the context that the touching of J.D. was the only suggested inappropriate touching that was alleged.  Further, during the officer's testimony, the judge instructed the jury that they were not to consider the officer's questions "to the extent that they imply such knowledge of the case."  In addition, the defendant had admitted to "bumping" children at the restaurant.

We reject the defendant's suggestion that this bad act evidence overshadowed the trial.  The Commonwealth presented its case over three days; this bad act evidence consisted of the brief testimony of three witnesses (covering approximately forty pages).  The incident involving J.D. was no worse than the conduct alleged at trial.  Further, the jury acquitted the defendant on the indictment alleging indecent assault and battery of Jane, which demonstrates a careful consideration of the evidence.

b.  Admissibility under constitutional principles.  In addition to arguing that the evidence concerning J.D. was inadmissible under evidentiary principles, the defendant also argues that the admission of this evidence violated his constitutional rights.  Specifically, for the first time on appeal, the defendant argues that it was a violation of his rights to due process and a fair trial under art. 12 of the Massachusetts Declaration of Rights to admit the evidence concerning the alleged incident involving J.D. because he had been acquitted of that charge (acquittal evidence).  He also contends that art. 12 "demands that the Commonwealth be collaterally estopped from introducing such evidence."  The defendant's arguments turn not on the fact that there was a prior "bad act," but rather on the fact that the defendant had been acquitted of the charge, which he suggests necessarily means that he did not commit the underlying conduct forming the basis for the charge.

The defendant's argument has been rejected under the Federal Constitution.  "As a matter of Federal constitutional law, collateral estoppel does not bar the government in a criminal prosecution from introducing evidence from a separate prosecution on unrelated charges in which the defendant was acquitted."  Francis, 432 Mass. at 359 n.5.  In Dowling v. United States, 493 U.S. 342 (1990), the United States Supreme

Court held that because of the different standards of proof, the introduction of so-called acquittal evidence did not violate the collateral estoppel component of the double jeopardy clause of the United States Constitution. Id. at 348-349. The Court also concluded that its admission did not violate the Federal Constitution's due process clause. Id. at 352-354. Many courts have allowed the introduction of relevant evidence of prior charged incidents even where a defendant has been acquitted of such offenses. See Commonwealth v. Barboza, 76 Mass. App. Ct. 241, 243 n.6 (2010) (collecting cases). We, however, have not decided "whether under the Massachusetts Constitution evidence introduced in a criminal prosecution at which the defendant was acquitted may later be used against a defendant in an unrelated criminal prosecution." Krochta v. Commonwealth, 429 Mass. 711, 718 n.14 (1999).

We have observed that "[t]he Commonwealth's Constitution has no explicit double jeopardy provision." Commonwealth v. Forte, 423 Mass. 672, 674 (1996). See Kimbroughtillery v. Commonwealth, 471 Mass. 507, 510 (2015). "Certain double jeopardy concepts are no doubt embraced within the Massachusetts Constitution's due process of law provisions, but those provisions do not . . . provide protection greater than the explicit protections of the Federal double jeopardy clause." Forte, supra. In addition, double jeopardy concepts have been

embraced in statutory and common law.  Kimbroughtillery, supra.

Because the "same principles and protections" afforded by the

double jeopardy clause are similarly embraced in the doctrine of

collateral estoppel, we have often applied that common-law

doctrine to resolve claims of successive prosecutions for the

same offense.  See id. at 510-511.  In Commonwealth v. Benson,

389 Mass. 473, 478, cert. denied, 464 U.S. 915 (1983), we set

forth the general principles that we use in applying the

doctrine of collateral estoppel:

> "Collateral estoppel is an established rule of criminal
> law.  See Ashe v. Swenson, 397 U.S. 436 (1970);
> Commonwealth v. Lopez, 383 Mass. 497 (1981).  Collateral
> estoppel 'means simply that when an issue of ultimate fact
> has once been determined by a valid and final judgment,
> that issue cannot again be litigated between the same
> parties in any future lawsuit.'  Ashe v. Swenson, supra at
> 433.  See Commonwealth v. Scala, 380 Mass. 500, 503 (1980).
> The doctrine of collateral estoppel may work in two ways.
> First, it may bar totally a subsequent prosecution if one
> of the issues necessarily decided at the first trial is an
> essential element of the alleged crime in the second trial.
> Second, even if a prosecutor may proceed to a second trial,
> the doctrine may bar the introduction of certain facts
> determined in the defendant's favor at the first trial.
> See United States v. Lee, 622 F.2d 787, 790 (5th Cir.
> 1980).  The doctrine of collateral estoppel will preclude
> either the subsequent prosecution or the introduction or
> argument of certain facts, only if the jury could not have
> based their verdict rationally on an issue other than the
> one the defendant seeks to foreclose.  Ashe v. Swenson,
> supra at 444.  Whenever the doctrine of collateral estoppel
> is raised by a defendant, the task of the court is to
> decide exactly what issues were, or should have been,
> determined at the first trial. . . . See Sealfon v. United
> States, 332 U.S. 575, 578-579 (1948)" (footnote omitted).

In making this determination, the court must look for the concurrence of a (1) common factual issue, (2) prior determination of that issue between the same parties,[11] and (3) determination of that issue in favor of the party raising the doctrine of collateral estoppel.  See Lopez, supra at 499.  See also Kimbroughtillery, supra at 511.

It has been observed that a general verdict of "not guilty" that usually is rendered in a criminal case means that it is a "rare case where it [is] possible to determine with certainty what the jury in the earlier prosecution has decided."  United States v. Cioffi, 487 F.2d 492, 498 (2d Cir. 1973), cert. denied, 416 U.S. 995 (1974).  "A finding of not guilty at a criminal trial can result from any number of factors having nothing to do with the defendant's actual guilt."  Benson, 389 Mass. at 481, quoting Commonwealth v. Cerveny, 387 Mass. 280, 285 (1982).[12]  "It is sometimes possible to determine that the

---

[11] The prior adjudication must have applied to the Commonwealth and to the defendant now invoking the doctrine. Commonwealth v. Stephens, 451 Mass. 370, 379-380 (2008).  See Commonwealth v. Benson, 389 Mass. 473, 478 n.6, cert. denied, 464 U.S. 915 (1983) ("doctrine of collateral estoppel only applies in a criminal case where there is mutuality of the parties").

[12] "A not guilty verdict may result from an exclusionary rule of evidence, inadequate investigation or proof, the composition of the jury, or the defendant's own insanity. Moreover, the jury may assume the power to acquit out of compassion or prejudice, and the prosecution is then powerless

jury's verdict necessarily implies one or more particular findings of fact, but such a determination requires a showing of the evidence adduced at the trial and the instructions under which the jury arrived at its verdict." Commonwealth v. DeCillis, 41 Mass. App. Ct. 312, 315-316 (1996), citing Sealfon, 332 U.S. at 579.

Here, the defendant is not seeking to foreclose a second prosecution of charges based on the alleged incident with J.D. Rather, the defendant seeks to use the doctrine of collateral estoppel in order to "bar the introduction of certain facts determined in the defendant's favor at the first trial" involving J.D., for which he was acquitted, at the trial involving the complainants Susan and Jane. See Benson, 389 Mass. at 478. Application of the doctrine of collateral estoppel as enunciated above, however, demonstrates that its essential components technically have not been met. First, the acquittal evidence was admitted pursuant to a lower standard of proof than that required for a conviction, and second, the defendant has not satisfied his burden of showing that the jury in the trial involving J.D. "necessarily decided" that he did not engage in unlawful sexual conduct with J.D.

---

to seek a judgment notwithstanding the verdict or a new trial on the ground that the verdict is against the weight of the evidence." Commonwealth v. Cerveny, 387 Mass. 280, 285 (1982).

These determinations, however, do not resolve the issue. Not all State courts follow the Supreme Court's holding in Dowling, supra. See State v. Perkins, 349 So. 2d 161, 163-164 (Fla. 1977); State v. Mundon, 129 Haw. 1, 4 (2012); State v. Wakefield, 278 N.W.2d 307, 309 (Minn. 1979); Kerbyson v. State, McMichael v. State, 98 Nev. 1, 3-4 (1982); State v. Scott, 331 N.C. 39, 42 (1992); State v. Holman, 611 S.W.2d 411, 413 (Tenn. 1981); 711 S.W.2d 289, 290 (Tx. Ct. App. 1986). As noted by Justice Brennan in his dissenting opinion in Dowling, there are a number of inherent problems in admitting evidence of a crime for which a defendant was acquitted despite its relevance on issues other than propensity in a subsequent trial:

> "First, '[o]ne of the dangers inherent in the admission of extrinsic offense evidence is that the jury may convict the defendant not for the offense charged but for the extrinsic offense. This danger is particularly great where . . . the extrinsic activity was not the subject of a conviction; the jury may feel the defendant should be punished for that activity even if he is not guilty of the offense charged.' . . . Alternatively, there is the danger that the evidence 'may lead [the jury] to conclude that, having committed a crime of the type charged, [the defendant] is likely to repeat it.' . . . Thus, the fact that the defendant is forced to relitigate his participation in a prior criminal offense under a low standard of proof combined with the inherently prejudicial nature of such evidence increases the risk that the jury erroneously will convict the defendant of the presently charged offense." (Citations omitted.)

Dowling, 493 U.S. at 361-362 (Brennan, J., dissenting). "Moreover, because of the significance a jury may place on evidence of a prior criminal offense, presenting a defense

against that offense may be as burdensome as defending against the presently charged offense." Id. at 362 (Brennan, J., dissenting). "[Because] the lower standard of proof makes it easier for the jury to conclude that the defendant committed the prior offense, the defendant is essentially forced to present affirmative evidence to rebut the contention that he committed that offense." Id. (Brennan, J., dissenting).

Justice Brennan also observed that the use of acquittal evidence offends the established interests of preserving the finality of judgments and protecting individuals from governmental overreaching. Id. at 355 (Brennan, J., dissenting). Because of the nature of a "not guilty" verdict, it is difficult, at best, for a defendant to prove what issues were "actually decided" in the earlier proceeding at which he was acquitted. Id. at 357-358 (Brennan, J., dissenting). The result is inconsistent with the Supreme Court's "admonition in Ashe that an excessively technical approach to collateral estoppel 'would, of course, simply amount to a rejection of the rule of collateral estoppel in criminal proceedings, at least in every case where the first judgment was based upon a general verdict of acquittal.' [Ashe, 397 U.S. at 444]. Indeed, forcing defendants to choose between forgoing the protections of the Double Jeopardy Clause and abandoning the defense of a general denial raises grave due process concerns." Dowling,

supra at 358 (Brennan, J., dissenting).  Justice Brennan also found fault with the fact that the majority applied its reasoning to a successive criminal prosecution (and not a civil remedial proceeding as done in past cases) "in which the Government [sought] to punish the defendant and [based] that punishment at least in part on a criminal act for which the defendant [was] acquitted."  Id. at 360 (Brennan, J., dissenting).

We find the thoughtful and extensive considerations enunciated in the dissenting opinion in Dowling to be instructive, and we conclude that the collateral estoppel protections necessarily embraced by art. 12 warrant the exclusion of the acquittal evidence in the circumstances of this case, a subsequent criminal proceeding involving alleged unlawful sexual conduct with minors.[13]  See Arizona v. Evans, 514 U.S. 1, 8 (1995) (State courts "are absolutely free to interpret [S]tate constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution").  We agree with Justice Brennan that the majority in Dowling does precisely what the Supreme Court in

---

[13] Our holding is limited to prior bad act evidence for which a defendant was acquitted.  Our holding does not apply to the admission of prior bad act evidence where no criminal charges were commenced, where the criminal charges are pending, or where the criminal charges were dismissed before trial.

<u>Ashe</u> admonished, employing a hypertechnical application of the collateral estoppel doctrine. We add that such an approach offends the principles of the presumption of innocence, the significance of being treated "legally innocent" that results when the prosecution fails to prove a defendant guilty beyond a reasonable doubt, and notions of fairness and finality.

Where the acquittal evidence was improperly admitted, we must now determine whether its admission created a substantial risk of a miscarriage of justice. See <u>Commonwealth</u> v. <u>Jackson</u>, 419 Mass. 716, 719 (1995) (when issue appealed is not properly preserved below, we reverse if error created substantial risk of miscarriage of justice). We conclude that it did. Although Susan and Jane may have presented as strong witnesses, their testimony acquired such force in part from the admission of the acquittal evidence. As a result, the defendant was put to the task of defending against not only the allegations involving Susan and Jane, but also those involving J.D. The trial involving the complainant J.D. had taken place approximately <u>twelve years</u> before the trial involving Susan and Jane, too remote in time not to result in prejudice to the defendant in having to defend again against those charges (because the defendant was acquitted, no record of testimony even exists). The judge's limiting instruction could not remedy such a defect, particularly where the prosecutor in this case only had to prove

that that the defendant committed the acts involving J.D. by a preponderance of the evidence.  We are constrained to reverse the defendant's convictions.[14]

Conclusion.  For the reasons stated herein, the defendant's convictions are reversed and the cases are remanded for a new trial.

So ordered.

---

[14] Our conclusion obviates the need to address the remaining issues argued by the defendant.  That said, we agree with the resolution of those issues by the Appeals Court and see no basis to reverse the defendant's convictions or order a new trial on those grounds.